170 So. 756

DeMOVILLE v. MERCHANTS & FARMERS BANK OF GREENE COUNTY et al.

2 Div. 71.

Supreme Court of Alabama.

Oct. 29, 1936.

Rehearing Denied Dec. 3, 1936.

206

J. F. Aldridge, of Eutaw, and Cabaniss & Johnston and K. E. Cooper, all of Birmingham, for appellant.

Knox, Acker, Sterne & Liles, of Anniston, and Harwood & McQueen, of Tuscaloosa, for appellees.

BROWN, Justice.

Bill by mortgagor, debtor, against mortgagee, purchaser at foreclosure sale, and purchasers of collaterals from the mortgagee after foreclosure, seeking to set aside the foreclosure, an accounting and redemption under the equity of redemption, and, in the alternative, to exercise the statutory right of redemption and an accounting by the mortgagee for the value of collaterals and chattels appropriated.

The circuit court denied complainant relief under the first alternative of the bill, but upheld his right to statutory redemption.

Pending the taking of testimony, the complainant became non compos mentis, and was committed to the Government Hospital for the treatment of insane veterans of the World War, Augusta, Ga., and Keith Legare was allowed to intervene as next friend and continue the prosecution of the suit in the name of appellant. Kelen v. Brewer et al., 221 Ala. 445, 129 So. 23. K. E. Cooper was also appointed by the court as guardian ad litem to represent the non compos mentis. This appeal is prosecuted by the next friend and guardian ad litem in the name of the complainant, De Moville.

While there are some conflicts in the evidence as to minor details, the controlling facts appear without dispute, bringing the case within the exception to the general rule, that the findings of fact by trial courts on evidence given ore tenus are, on appeal, accorded the weight of the verdict of a jury, and will not be disturbed unless plainly contrary to the great weight of the evidence. Marsh v. Elba Bank & Trust Co., 205 Ala. 425, 88 So. 423; Bowling v. State, 204 Ala. 405, 85 So. 500; Scott v. McGriff, 222 Ala. 344, 132 So. 177; Duggan v. Duggan, 227 Ala. 92, 148 So. 844; Henderson v. Henderson, 228 Ala. 438, 153 So. 646; Murphree v. Hanson, et al., 197 Ala. 246, 72 So. 437.

Appellant's father, A. B. De Moville, up until his death in 1927, resided at Boligee, Greene County, Ala.; owned and operated the cotton plantation involved in this litigation, by letting parcels thereof to negro tenants and advancing to them from his store which he operated in one department of the block of brick buildings which he also owned. The complainant "grew up in this business," and the plantation, the mercantile business, the business property in which it was conducted, and some of the bills receivable, accounts and liens for advances, passed to him under his father's will. It also appears that the father had been a patron of the defendant Bank and had an account at said Bank, back as early as 1924, which passed to appellant with the business. On this account a liability, unsecured, had accrued against appellant by February 2, 1931, amounting to $11,000. And the Bank had procured from some source a like account for which he was liable amounting to $4,000. On the date above-mentioned, the respondent Bank loaned appellant $5,000, and procured the execution of the mortgage, the subject-matter of this litigation, by appellant and his wife for the aggregate of said sums—$20,000—payable October 1, 1931, covering said plantation, consisting of 600 acres, 50 per cent. of which was in cultivation, on which were situated several tenant settlements—eight to ten; and the business property in Boligee.

In addition to the real property covered by the mortgage, the appellant pledged with the Bank collateral, consisting of two or more blocks of gin stock of the par value of $6,000, several mortgages on real and personal property, specifically described in the mortgage, and upward of a hundred chattel mortgages given by tenants for advances, covering crops, personal property consisting of horses, mules, and cattle, and farming implements.

These several chattel mortgages and liens were in face amount upward of $15,000. Appellant's evidence tends to show the face value much higher—$34,000. These chattel mortgages and liens were described generally in the mortgage executed to the Bank thus: " * * * *And also all crop and personal property mortgages and liens and claims for advances and rents of every kind and description for the year 1931, or prior thereto.*" (Italics supplied.)

The mortgage recites "that, whereas, the undersigned J. F. DeMoville, is justly indebted unto the Merchants & Farmers Bank of Greene County, Eutaw, Alabama, in the sum of Twenty Thousand ($20,000.00) Dollars, which is evidenced by his promissory note, for that sum, bearing even date herewith, and payable to said Merchants & Farmers Bank of Greene County or order on the first day of October, 1931, which said note bears interest from date, waives all exemptions, *provides for the payment of attorneys' fees,* and is payable at said Merchants & Farmers Bank of Greene County, Eutaw, Alabama; *and whereas, said indebtedness was contracted with the understanding and agreement of the parties hereto that this mortgage should be given to secure the payment of the same.*" (Italics supplied.)

The mortgage also embodied the following:

"But should we fail to pay said note, at maturity, then said mortgagee, its successors, assigns, and agents are hereby authorized and empowered to take immediate possession of the property hereby conveyed; *and sell the real estate at public auction,* for cash, before the court-house door of Greene County, Alabama, first having given twenty days' notice thereof by publication once a week for three successive weeks in any newspaper then published in Greene County, Alabama, and execute proper conveyance to the purchaser; and out of the proceeds of said sale, it shall first pay all of the expenses incident thereto, together with a reasonable attorney's fee; then retain enough to pay said note, and the balance, if any, pay over to us. In the event of such sale or of any sale hereunder, said mortgagee, its successors, assigns, and agents are hereby authorized and empowered to purchase said property or any part thereof, the same as if they were strangers to this conveyance, and the person making the sale is directed and empowered to execute *and deliver a deed to the purchaser* in our names. (Italics supplied.)

"No notice is required for the sale of the mortgages, crops and personal property, but the same may be sold at any time and place, with or without notice, public or privately, and the proceeds applied as herein directed."

Appellant failed to pay the debt on its due date, and in the light of the circumstances existing at the time the mortgage was executed, as the evidence shows, no other result could have been well anticipated.

The appellee Bank placed the mortgage in the hands of its attorney, who was also one of the Bank's directors, with instructions to cooperate with the mortgagor in reduc-

ing the indebtedness; the president of the Bank stating, in substance, that if the indebtedness was reduced to $10,000 the papers would be renewed and the balance carried over until the fall of 1932.

The Bank's attorney kept constantly in touch with De Moville from about October 10, 1931, up until late in December, 1931, and in that time De Moville collected and delivered to the Bank 206 bales of cotton which were immediately sold for less than the cost of production; and sold at a sacrifice the "cream" of the collateral mortgages: one of the face value of $1,400 was sold for $375, another of the face value of $524.62 for $150, and 22 head of cattle; this effecting the reduction of the debt by the sum of $7,500.

The Bank consented that the mortgagor might purchase the remaining collateral mortgages and liens for $2,000, and De Moville made every effort to raise the money or induce some of his friends or unsecured creditors to purchase them, but failed. Said remaining collateral mortgages of the minimum face value, in round numbers, of $14,000, were offered by the attorney of the Bank to every person in Greene county, except the defendant Banks & Co., who was thought to be able to purchase and handle the same; also to persons in Columbus, Mississippi, and Tuscaloosa, Ala., without finding a purchaser.

On January 8, 1932, the property covered by the mortgage including the collaterals, was advertised for sale on Friday, January 29, 1932, "before the court-house door" in Eutaw. The upward of a hundred chattel mortgages held as collateral were described in the foreclosure notice in these words: "* * * *  *also all crop and personal property mortgages and liens, and all liens and claims for advances and rents of every kind and description for the year of 1931 or prior thereto, due to said J. F. DeMoville in anywise." (Italics supplied.)

On the day of the sale, after "drumming up a crowd" by going around the block at the courthouse in Eutaw, 40 or 50 people came together, most of them through curiosity, as the evidence shows, the property was offered for sale, the Bank's attorney and agent crying the sale. The block of stores was first offered. No one bid except the mortgagee, and the property was, conditionally, knocked down on its bid of $5,000. The plantation was next offered. No bids except by the Bank, and it was sold, conditionally, to the Bank on its bid of $3,000. The gin stock was next offered—60 shares of the capital stock of the Greene County Gin & Cotton Company, located at Boligee. The attorney conducting the sale testified: "There was some lively bidding between the Bank and R. G. Colson on that stock, and it was finally knocked off to Mr. Colson, tentatively for $2300.00. * * * That left these mortgage lien accounts at that time; but after the gin stock was disposed of I announced there was some cattle in a pasture near Boligee, some 13 or 14. I was not positive about whether it was 13 or 14, because Mrs. J. F. DeMoville claimed one cow as her own; but those animals were also covered by the mortgage papers which I had and they would be put up for sale; but I would also put up that property and receive bids for it. * * * I stated Mrs. DeMoville claimed one, I could not guarantee that one. * * * Some people were showing a disposition to get away. Quite a number of people were leaving; and I thought I would try the cattle. * * * Quite a number of bids were made. I don't recall the exact bids, but quite a number. The last and high bid was made by the Merchants & Farmers Bank. * * * That bid was $102.00."

The collateral mortgages were offered next. The witness testified: "I stated that the individual mortgages would be sold, and that I had gone through them very carefully and attempted to sort out those that had some value and those that were understood to have no value or practically no value; that there were 59 of those that had some value, and practically the same number that had no value." (Italics supplied.) The mortgagee Bank then bid $1 each for those that were represented to have some value, and no other bid being made, they were knocked down tentatively to the Bank. No bids were made on the 59 or more stated to have no value.

All the property previously offered, as above stated, was then offered as a whole, and knocked down on the bid of the mortgagee Bank for the alleged balance due on the mortgage debt—$14,188.25.

As the evidence shows, cotton is the basic commodity of the territory in which Greene county is located; that on January 29, 1932, it was selling on the market for 5⅜ per pound lint, far below the cost of production; that there was no market for the class of property covered by the mortgage, with the possible exception of the gin company

stock; that on said date that section was at the very depth of the depression, and the specter of foreclosure was stalking that territory, with no one to bid or purchase, except mortgagees.

The witness Wilkes C. Banks, shown to be a business man of long experience, testified on direct examination by defendants' counsel:

"Q. There was no absorbing quality in the market at that time for them? A. No paying ability, I believe I would say. * * * There were no sales [of real estate] and very low.

"Q. As a matter of fact were you practically in a condition of paralysis? A. Correct.

"Q. In Alabama in the early part of 1932? A. Correct.

"Q. It was a rare and exceptional case when real or personal property could be sold to anybody for cash? A. Correct. * * *

"Q. How long have you been in business? A. 25 years.

"Q. How did economic conditions in the early part of 1932, January and February, compare with economic conditions in any other times you have known before or since? A. I believe it was worse at that particular time.

"Q. Can you remember at any time when conditions were as demoralized, when business was as much paralyzed, and values were as low as during the early part of 1932? A. No.

"Q. Nothing before, in your experience, before or since, was as bad as that? A. No, sir."

The evidence further shows that the appellant mortgagor, responding to the urgent demand of the mortgagee that the debt be reduced, applied every cent he could rake and scrape to that end, with the hope of gaining an extension of time, in consequence of which he could not meet other debts, and on the day previous to the foreclosure an involuntary petition in bankruptcy was filed against him, which eventuated in an adjudication of bankruptcy. The evidence further shows that the mortgage and pledges to the respondent Bank covered practically all property of the bankrupt subject to debts, and that what remained was not sufficient to pay the costs of administering the bankrupt's estate.

After procuring a discharge in bankruptcy, appellant purchased from the trustee in bankruptcy of his estate, all the rights of the trustee in the property embodied in the respondent Bank's mortgage, and all rights of redemption in respect thereto.

A few days after the foreclosure the collateral mortgages were sold by the Bank to Banks & Co., a partnership composed of J. O. Banks and his three sons, Wilkes C., Ralph R., and John C. Banks. J. O. Banks was at the time president of the Bank and a stockholder therein; Wilkes C. was also a stockholder and a director. The price paid was $1,600. The gin stock was sold by the Bank, acting through its president, J. O. Banks, to M. G. Bouchelle, or through him to the gin company of which he was a stockholder and officer, for $4,500. Twenty-four hundred dollars was credited on the De Moville mortgage transaction on the books of the bank, and the balance to undivided profits, less $450 to the Bank's attorney as a commission and for services rendered or to be rendered in respect thereto. Later the amount of the sale price of the stock was credited to the De Moville transaction by the Bank, less commission to its attorney.

There is a great diversity in the testimony of witnesses who express opinions as to the value of the property embodied in the foreclosure sale. The testimony given by the complainant and his witnesses goes to show a value from $28,000 to upward of $39,000, while that on the part of the defendants and their witnesses goes to show a value of from $14,000 to $15,000.

The opinion evidence of the witnesses offered by the defendants as to the value of the property on the date of the foreclosure was based largely on the fact that there was no market at that time and place —no one could be found who was able, willing, and ready to purchase—because of the depression which had destroyed business confidence and produced uncertainty as to economic conditions and the lack of faith in any kind of an investment. The evidence goes to show that nothing was bought or sold except bare necessities.

█ It is a matter of which courts take judicial knowledge, that the depression at its worst did not destroy the intrinsic value of farm and business property, and the mere fact that there was no market, that no one was willing or able to buy, is not an insuperable obstacle defying the ascertainment of real values.

█ The yardstick of "reasonable market value" fixed by the law in a proper case

for the purpose of ascertaining values, by courts and juries, presupposes a market for the class of property, the subject-matter of the litigation, and where there is no market at the time for such property, other elements are to be taken into consideration, such as the original costs, the costs of the buildings or improvements, rents, the adaptability for future use and enjoyment, and the opinion of witnesses in a position to have a correct judgment as to the values. 22 Corpus Juris, Evidence, §§ 118, 119, p. 177, § 133, p. 182, § 140, p. 184, § 141, p. 185, § 147, p. 186; Jennings v. Oregon Land Co., 48 Or. 287, 86 P. 367; Jacksonville, T. & K. W. Ry. Co. v. Peninsular Land, Transportation & Mfg. Co., 27 Fla. 1, 157, 9 So. 661, 680, 17 L.R.A. 33, 65; Hollinger v. Missouri, K. & T. R. Co., 94 Kan. 316, 146 P. 1034, Ann.Cas.1916D, 802.

The Florida Supreme Court, in the case above cited, stated the rule clearly in these words: "Wherever there is a well-known or fixed market price for any property, the value of which is in controversy, it is proper, in establishing the value, to prove such market value; but, in order to say of a thing that it has a market value, it is necessary that there shall be a market for such commodity; that is, a demand therefor,—an ability, from such demand, to sell the same when a sale thereof is desired. Where, therefore, there is no demand for a thing, —no ability to sell the same,—then it cannot be said to have a market value 'at a time when, and at a place where,' there is no market for the same." This utterance was adopted and approved by the Kansas Supreme Court in the case last above cited. To like effect, see Cooney v. Pullman Palace-Car Co., 121 Ala. 368, 25 So. 712, 53 L.R.A. 690; Buerger v. Mabry, 15 Ala. App. 241, 73 So. 135; State v. Stoddard, 13 Ala.App. 560, 69 So. 980; 10 R.C.L. 975, § 128.

The business property, as the evidence shows, consists of two brick buildings with an aggregate frontage of 104 feet on the main street in Boligee: one a single story, 50 by 60 feet, and the other a two-story building 54 by 78 feet; the first constructed in 1923 at a cost of $9,000, the other in 1927 at a cost of $14,000, and combined constitute floor space for four stores on the ground floor, with cement floors, convertible into three big stores and space for a barber shop, and eleven apartment rooms on the second floor with bathrooms and big hall, on which was carried upward of $14,000 insurance, with three-fourth value clause.

The rents, prior to foreclosure, ran from $1,000 to $1,200 per annum.

The cotton plantation originally consisted of 790 acres of which 190 acres were sold during the years from 1927 to 1929 for $26 per acre and upward; some as high as $28.50, all cash. This left 600 acres, 50 per cent. of which was in cultivation and on which were located ten tenant farms or settlements occupied by active negro tenant-farmers.

Whether the upward of 200 bales of cotton collected by De Moville and the Bank were produced on said farm is not clear, but the evidence sustains the conclusion that a considerable portion of it was. Nine to ten bales of cotton rent were obtained therefrom in the years previous to the foreclosure, and as much as ten bales since. In addition to the cotton, the plantation produced corn and other farm products.

The gin stock speaks for itself. The Bank sold it for $4,500, and the purchaser testified that it was reasonably worth that sum. The respondent was not entitled to allow commission for making the sale.

The question of the intrinsic value of the chattel mortgages and liens appropriated by the Bank and sold to Banks & Co. is more difficult. As to this class of property one fact stands out clearly—it is worth more to the original owner than to any one else. These collaterals clearly had no market value; they had been offered, according to defendants' own testimony, to every person who it was thought could purchase, without finding any one, except Grubbs, who would make any kind of an offer. At the public sale one half of them provoked a bid of $59. No one bid on the other half. Their reputation as to "some value" and "supposed no value" stated at the sale had probably gone with them in connection with this private search for a purchaser. The following facts stand out in bold relief, however: After their purchase by Banks & Co. from the Bank, most of them were used as a basis of further credit and advances to the makers thereof, and therefrom upward of $9,500 was collected thereon, out of which, after repaying themselves for the first cost, $1,600 they paid to the Merchants & Farmers Bank for the upward of 100 mortgages and liens, and $250 paid to the First National Bank of Eutaw to discharge a first

lien *on three of said accounts,* and for the advances, supervision, and "new money" put into them, they had a clear profit, to state it in round numbers, of about $2,500 collected, and a like sum outstanding and collectable.

There is another outstanding fact. The mortgagee Bank stimulated hope in the mortgagor by telling him if the debt was reduced to $10,000, the balance would be carried over for another season. The president of the Bank instructed its agent and attorney to co-operate with De Moville, the mortgagor, to that end. The Bank clearly held the "whip-hand"; holding all the liquid assets of the mortgagor as collateral, he could not move without the Bank's consent and co-operation, yet ruin and bankruptcy were staring him in the face. The only co-operation attempted was in the sale of the cotton and the "cream" of the chattel mortgages at a sacrifice, and in procuring the Bank's consent that the mortgagor might withdraw from the pledge of collaterals—the chattel mortgages—upon payment of $2,000, which, as we have shown, he was unable to do. The most liquid asset, or the one most easily sold—the gin stock—was left to rest in the hands of the Bank, though by its sale the indebtedness could have been reduced below $10,000, leaving the Bank's mortgage abundantly secured. By so doing De Moville could have probably secured an extension, and saved these collaterals as a nucleus for further business opportunity and recovery.

While it appears that the mortgagor was an educated man—had attended college—yet the circumstances in evidence indicate that he was simple-minded, and, as to business transactions, was not in the class with the seasoned, diplomatic business men who acted for and represented the Bank mortgagee; that he was, in the language of some of the cases, a "necessitous man," not free to exercise his own will and judgment in respect to the property available for the reduction and payment of the mortgage debt. Pearsall v. Hyde, 189 Ala. 86, 66 So. 665; Shaw v. Lacy, 199 Ala. 450, 74 So. 933.

■ Now to dispose of some of the preliminary contentions of the parties. We think it very clear that the general power of sale embodied in the mortgage relates solely to the real estate embodied in the mortgage. The words "or any sale hereunder" refer to the power, not the entire instrument. There is a specific provision as to the collaterals, in these words: "No notice is required for the sale of the mortgages, crops and personal property, but the same may be sold at any time and place, *with* or without notice, publicly or privately, and the proceeds applied as herein directed." The power to make a private sale of the collaterals without notice is inconsistent with the thought that the donee of the power may be both the seller and the purchaser.

■ While this special grant of power to sell the collaterals—chattel mortgages and liens—authorized the sale without notice at the option of the pledgee, nevertheless it had the option to sell with notice. When it exercised the option to sell with notice, the statute, in the absence of anything to the contrary in the power, prescribed the character of notice to be given; that is, "such notice must describe the securities or property." Code 1923, § 6746; Stanley v. People's Sav. Bank, 229 Ala. 446, 157 So. 844.

"It is well settled that in the absence of any controlling agreement to the contrary, where a pledgee elects to sell the pledged property without resort to judicial proceedings, he must sell at public auction, and this is expressly required by statute in some states. In making the sale the pledgee must exercise reasonable skill and diligence in order to get the value of the property; and this includes the fixing of reasonable time and place of sale, and while there are few decisions with respect to the giving of notice to the general public, it would seem that the sale should be preceded by such notice as is ordinarily given for auction sales of like property in the same locality. Without some such notice it is clear that the property must ordinarily be sacrificed for want of bidders; for to bring out bidders persons interested in the class of property to be sold must in some way have their attention called to the sale." 21 R.C.L. pp. 691, 692, § 51; Bryson v. Rayner, 25 Md. 424, 90 Am.Dec. 69; Laclede National Bank v. Richardson, Administrator, 156 Mo. 270, 56 S.W. 1117, 79 Am.St.Rep. 528.

■ The statement in the foreclosure notice that "all crop and personal property mortgages and liens and claims for advances and rents of every kind and description for the year 1931 or prior thereto," is too indefinite to meet the requirements of the statute that the securities or property must be described, and to inform the public

of the character and kind of securities or property to be offered for sale.

■ The mortgagee Bank as pledgee and trustee for the pledgor had the right to foreclose the several chattel mortgages, the subject of the pledge, on default of the mortgagors in such mortgages, and sell the livestock covered by the chattel mortgages, on proper notice. 19 R.C.L. p. 522, § 322; Kelly v. Carmichael, 217 Ala. 534, 117 So. 67.

However, the Bank mortgagee was without right or authority to sell the 14 head of livestock in the pens at Boligee, some miles distant from Eutaw, under the power of sale embodied in the mortgage executed by De Moville and wife to it, not only because said livestock was not present at the time and place of sale, but because it was not covered by the mortgage being foreclosed, nor the notice of foreclosure. Dewberry et al. v. Bank of Standing Rock et al., 227 Ala. 484, 150 So. 463.

■ It is a sufficient answer to appellees' contention that the proceedings in the federal court are res judicata as to the right of the mortgagor De Moville to have the foreclosure sale vacated, that it does not appear therefrom that said sale was confirmed. This could only be shown by record evidence, and the record of the proceedings shows that the petition filed by the trustee in bankruptcy to vacate the sale was dismissed by the bankruptcy court *without prejudice* to the rights of De Moville to proceed. Campbell v. Beyers et al., 189 Ala. 307, 66 So. 651; Ex parte Lineville Nat. Bank, 217 Ala. 381, 116 So. 419.

■ The contention of appellee, Banks & Co., that the transfer or deed executed by the trustee in bankruptcy to De Moville, was champertous in that the right of action to have the foreclosure sale vacated arises out of a tort—fraud—and is nonassignable, is likewise untenable. The tort, such as it was, was committed against De Moville before his adjudication and was a wrong against his estate. The effect of the transaction between the trustee and De Moville, the bankrupt, in which the deed was given, was an abandonment by the trustee to De Moville of all rights incident to the protection and recovery of his estate—the equity of redemption—of which he was deprived by the foreclosure if the same was oppressive or wrongful, and as against the mortgagee and those claiming under it the case stood as though bankruptcy had not intervened. Watson v. Motley, 201 Ala. 25, 75 So. 147; All States Life Ins. Co. v. Jaudon, 228 Ala. 672, 154 So. 798, 94 A L.R. 1128; Houston v. National Mutual Building & Loan Ass'n, 80 Miss. 31, 31 So. 540, 92 Am.St.Rep. 565.

■ After mature consideration of the voluminous record, we are constrained to concur in the conclusion of the learned circuit judge, that the complainant has failed to meet and carry the burden of showing a fraudulent conspiracy between the respondents, the mortgagee Bank, and the partnership of Banks & Co., or the individuals constituting said partnership, to sacrifice the property covered by the mortgage to their gain and complainant's hurt, charged in the bill. Therefore, the decree, in so far as it denies relief against said respondent Banks & Co., and the individuals composing the firm, is due to be affirmed.

■ Conceding that the mortgagee was within its rights in electing to sell the real estate covered by the mortgage in advance of a sale of the collaterals (though there are authorities to the contrary, 1 Wiltsie on Mortgage Foreclosures (4th Ed.) p. 241, § 173; same author, 1st Ed., p. 313, § 263; Koger v. Weakly et al., 2 Port.[516]), it was charged with the duty arising out of the trust, to act in good faith and "adopt all reasonable modes of proceeding in order to render the sale beneficial to the debtor," and it is familiar law, in most every jurisdiction, that anything done by the party conducting the sale calculated to prevent competitive bidding or discourage it, renders the sale void. 19 R.C.L. page 613, § 430; Longwith v. Butler, 3 Gillman (8 Ill.) 32; Mapps v. Sharpe & Company, 32 Ill. 13; Miltenberger v. Morrison et al., 39 Mo. 71; Jackson ex dem. Bowers v. Crafts, 18 Johns. (N.Y.) 110.

The mortgagee, in conducting the sale, represents the interest of himself and the mortgagor, not the interest of the public. He has no right, and it is a breach of his duty, to voluntarily depreciate the value of the property and discourage free competitive bidding. Kelly v. Carmichael, 217 Ala. 534, 117 So. 67.

■ It is a sufficient answer to the insistence of appellees that the mortgagor De Moville ratified the foreclosure sale, that he was not present thereat, did not participate therein, and when he made the statements and performed the acts relied on, it does not appear that he had full knowl-

**214**

edge of the method of conducting the sale and all that occurred thereat. Sharpe v. National Bank of Birmingham, 87 Ala. 644, 7 So. 106.

■ After full consideration of the evidence in the case, we are clear to the conclusion that the price bid for the property at the mass sale thereof was greatly disproportionate to its value, and this fact, in connection with the circumstances attending the transaction which we have pointed out, rendered the foreclosure oppressive, and complainant was entitled· to have it set aside in order that he might exercise his equity of redemption. See Coleman v. Solomon et al., 225 Ala. 407, 143 So. 576; Oden v. King et al., 216 Ala. 504, 113 So. 609, 54 A.L.R. 1413; Hunter-Benn & Co. Company v. Bassett Lumber Co., 224 Ala. 215, 139 So. 348; Cotton et al. v. First Nat. Bank of Opp, 228 Ala. 311, 153 So. 225.

The decree of the circuit court, in so far as it denies the complainant the right to exercise his equity of redemption, is reversed, and a decree is here rendered granting the complainant relief. The foreclosure of the mortgage and the sale thereunder made at Eutaw on the 29th day of January, 1932, and the foreclosure deed executed in pursuance thereof, are hereby set aside, vacated, and held for naught, and complainant is allowed to exercise his equity of redemption.

The appellee, Merchants & Farmers Bank of Greene County, will pay the costs of the appeal, and the costs incurred in the circuit court, less the costs incurred in the circuit court at the instance of Banks & Co. and the individual members of the firm, which are taxed against complainant, De Moville.

The cause is remanded to the circuit court for a decretal order of reference to the register of said court to take and state an account between the parties.

Affirmed in part, and in part reversed, rendered and remanded.

GARDNER, THOMAS, BOULDIN, and FOSTER, JJ., concur.

ANDERSON, C. J., and KNIGHT, J., dissent.

KNIGHT, Justice (dissenting).

The evidence in this case was taken ore tenus before the court. It is voluminous. The findings of the same should be accorded the same effect as a verdict of a jury, and should not be disturbed unless plainly and palpably wrong. Caples et al. v. Young et al., 206 Ala. 282, 89 So. 460. ·

I cannot bring myself into accord with the conclusion of the majority of the court, as expressed in the opinion of Mr. Justice BROWN.

A careful consideration of the evidence fails to convince me that the mortgagee, in foreclosing its mortgage under the power of sale, was guilty of any fraud or imposition, or of any act of oppression or overreaching.

Likewise, the evidence fails to convince me that the price paid for the property was so grossly inadequate as to shock the conscience of the court.

The evidence also fails to disclose any circumstance, which, fairly considered, would justify a court of equity in setting aside the foreclosure proceedings.

The record shows further, that, in proceeding to the foreclosure sale, the mortgagee Bank duly observed each and every requirement of the power of sale.

My judgment is the decree of the circuit court should be affirmed.

I therefore respectfully dissent.

ANDERSON, C. J., concurs in this dissent.