On August 27, 1999, Robin Pitts ("Robin") sued Jim Walter Resources, Inc. ("JWR"), alleging breach-of-contract and fraud claims. On June 8, 2001, his twin brother Ronald Pitts ("Ronald") sued JWR, alleging the same claims. The two cases were consolidated for trial pursuant to Rule 42(a), Ala. R. Civ. P. JWR moved for a partial summary judgment on Ronald's fraud claim, arguing that the claim was barred by the applicable statute of limitations. The trial court granted that motion.
The cases were tried before a jury. At the close of the plaintiffs' case-in-chief, JWR moved for a judgment as a matter of law ("JML") on Robin's fraud claim, arguing that Robin had presented insufficient evidence of the "reliance" element of fraud. The trial court granted JWR's motion with respect to one part of Robin's fraud claim but reserved its ruling with respect to another part of the claim. The trial court held that, after a certain date, Robin's reliance on JWR's alleged misrepresentation was unreasonable, but before that date, a question of fact existed as to whether Robin's reliance was reasonable. At the close of all the evidence, JWR renewed its motion, seeking a JML on all aspects of Robin's fraud claim. The trial court denied that motion, stating that it would allow one part of Robin's fraud claim to go to the jury but that it would not instruct the jury as to punitive damages for fraud because, it held, Robin had not submitted clear and convincing evidence in support of the fraud claim. The jury returned verdicts in favor of both brothers on their breach-of-contract claims, assessing damages in the amount of $21,300 for each brother. The trial court entered judgments on that verdict.
The brothers appeal, arguing that the damages awarded by the jury were inadequate because, they say, the trial court's erroneous evidentiary rulings prevented them from showing the full extent of their damages arising from JWR's breach of contract. In addition, both brothers contend that the trial court erred by instructing the jury that it could not award damages for breach of contract with respect to automobiles that, they say, JWR had promised, but failed, to give them. Finally, Robin argues that the trial court erred by entering a JML on one aspect of his fraud claim and by failing to submit to the jury the issue of punitive damages on the other aspect of his fraud claim.
 Factual Background
JWR is a wholly owned subsidiary of Walter Industries, Inc., a corporation headquartered in Tampa, Florida. JWR is the owner of the subsurface mineral rights on a 280-acre tract of land in sections 31, 34, and 35 of Township 20 South, Ranges 7 and 8 West, located in Tuscaloosa County, Alabama. Specifically, JWR owns two deep coal seams and the methane-gas rights, including three gas wells, on the property. United Land Corporation ("ULC"), JWR's sister corporation, is also a wholly owned subsidiary of Walter Industries. ULC is the owner of the surface rights, including the raw land, timber, surface-mineable coal, and sand and gravel, on the same tract. *Page 926 
In the early 1990s, JWR was attempting to lease its methane-gas rights to Taurus Exploration Co., Inc., when it learned of a title problem with the 280-acre tract. Jim Sledge, the title attorney employed by Taurus to do a title search, discovered that there had never been a patent issued to the original predecessor in interest of Walter Industries-JWR-ULC. A patent is the original land grant from the government that begins an owner's chain of title. The land had originally been severed from the United States pursuant to an 1841 act of Congress that distributed certain lands to the State of Alabama as "internal improvement" lands. The State was vested with title pursuant to the congressional act, and the State could be divested of title only if it had issued a patent to another owner. Sledge's title search revealed no patent from the State. Sledge applied to the State for a patent, but his request was denied. Without a patent, JWR did not have title and the property still belonged to the State. JWR and ULC referred to the 280-acre tract as the "title-defect properties."
Taurus went forward with the lease with JWR, but it also took a "protective" lease from the State. Taurus drilled three methane wells on the property and placed the royalties in a suspense account until the title issues could be resolved. In February 1997, the royalties in the suspense account totaled approximately $600,000.
In 1993, Ronald was working as an independent contractor "landman" for Black Warrior Methane Company ("BWMC"). JWR owns 50% of the stock of BWMC, and BWMC manages JWR's gas interests. A landman does title research, copies deeds and other title documents, performs curative title work under the direction of an attorney, and engages in other similar activities involving title issues. In 1993, BWMC controller Allen Bearden asked Ronald to review Sledge's title opinion on the title-defect properties. Ronald became interested in how to resolve the title defect and began taking the file home with him to study at night. Ronald continued to work on the title defect from 1993 to 1996. He decided that, in order to obtain a patent from the State, one would have to establish adverse possession by the predecessor in interest to JWR and ULC for 20 years before May 1, 1908. Sledge explained to Ronald that it was unlikely that adverse possession could ever be proven because the Tuscaloosa County tax assessor's records only went back to 1894, which was six years short of the time required for adverse possession.
In 1995, JWR explored several ways to deal with the title-defect problem. First, it tried to negotiate a "land swap" deal with the State, but the deal fell through. Then on November 21, 1995, JWR conditionally sold its royalty interest in the Taurus lease to TECO[1] for $3,700,000. Because of the title defects on the property, TECO held $600,000 of the purchase price in escrow, agreeing that, if the title defects were cleared up within a certain time period, then JWR would receive the $600,000 but that, if the defects were not cleared up within that time period, then the funds in escrow would revert to TECO and JWR would retain its royalty interest in the property. In October 1996, the time TECO had allowed JWR to correct the title defect expired and the $600,000 in escrow reverted to TECO. JWR retained its royalty interest under the existing Taurus lease.
Joe Spransy was the chief legal counsel for both JWR and ULC. Spransy held several officer positions in BWMC, JWR, ULC, and Walter Industries. Harold Rice *Page 927 
was the assistant legal counsel for JWR. In 1995, Spransy delegated to Rice the task of coordinating the curative work on the title-defect properties.
Ronald testified that in January 1997 he went to see Rice, whose office was in the same building where Ronald worked for BWMC, and told Rice that he had some ideas about how to obtain the State patents. Ronald said that, at first, Rice laughed at him and asked "how in the hell" he thought he could get the patents. Then, Ronald explained that he knew JWR/ULC would have to show adverse possession by their predecessors in interest for 20 years before 1908. He also stated that he knew there were some older property records in the Tuscaloosa courthouse attic that might be useful. Ronald testified that Rice responded, "If you can obtain those patents, you can name your price." Ronald told Rice that because he was working for BWMC he could work only part-time on the patent problem, but he suggested that his brother Robin, who is also a landman, might be able to help. Ronald also proposed that Rice employ Tommy Holley, a title attorney with whom Ronald had worked frequently, to supervise the project. According to Ronald, Rice agreed to Ronald's suggestions and told him to get started on the project. They agreed that Ronald and his brother Robin would be paid their usual landman's "day rate" of $200 per day plus expenses. They consented to meet later to specify the "name-your-price-bonus" that the two landmen would receive if they were successful in obtaining the patents.
On January 29, 1997, Spransy and Rice met with Ed Porter, legal counsel for Walter Industries, to discuss how to deal with the patent-defect problem. The three resolved to "leave no stone unturned" in order to obtain the patents. To that end, they agreed to employ Tommy Holley and to have the Pitts brothers assist Holley, in an effort to "get the patents."
On February 6, 1997, Holley met with the Pitts brothers at the Cypress Inn in Tuscaloosa. The following day, Spransy telephoned Holley and officially hired him to work on the project. On February 11, 1997, Holley began work on the first patent request. On the same day, he dictated the following memorandum to his file, summarizing his telephone conversation with Spransy:
 "This is a very important issue to JWR. Not only is the $600,000 at stake. There's also the possibility of JWR's being forced to turn over to the State any past revenues that JWR may have received from past timber and sand and gravel royalties. The amount at stake here could easily exceed $1 million. Spransy has been told by his bosses in Tampa to `leave no stone unturned.'"
Holley understood that he was working for JWR and ULC. He submitted invoices to ULC, but he always received payment from JWR. Holley answered to Spransy, whose correspondence with him was sometimes on JWR letterhead and sometimes on ULC letterhead.
On February 26, 1997, Robin began assisting Holley on the first patent request. The Pitts brothers testified that sometime before their birthday on March 24, 1997, they met with Rice to negotiate the details of the "name-your-price bonus" they were to receive if they were successful in obtaining the patents. Ronald testified that he proposed to Rice that the bonus bear some relation to the value of the land and the revenues it had generated, all of which might have to be forfeited to the State if they were not successful in obtaining the patents. Ronald first suggested that he and Robin each receive 6% of the value of the land and the past revenues it had generated; Rice rejected that, and Ronald *Page 928 
countered with 5%. Eventually, Ronald said, Rice agreed to pay each of the brothers 4% of the total value of the land and the past revenues it had generated. The Pitts brothers testified that they understood that the agreement did not call for the conveyance of an interest in the 280 acres to them. Instead, the value of the land was a reference point for designating the amount of money they would be paid as a bonus if the patents were obtained. Rice denied that the discussion recounted by the Pitts brothers had ever taken place. Specifically, he denied that he had agreed to pay them any bonus. He said that no one except the president of JWR could authorize a bonus.
Robin testified that, a few weeks after he and Ronald had the discussion with Rice in March, he brought his first invoice to Rice for payment. At that time, he said, Rice told him that he and Ronald would each receive a new Lexus automobile if the patents were obtained. Robin stated that every two weeks after that, when he submitted his invoices to Rice for payment, Rice would mention the bonuses and cars. Robin and Ronald both testified to several occasions when Rice would rattle a set of car keys and say, "You are getting close to that new Lexus and big bonus check."
Rice testified that he never promised either of the brothers a new Lexus. Rice said that once Ronald was in his office kidding with his secretary and stated, "Yeah, Harold ought to buy me a Lexus for this." Rice laughed but did not reply. Rice's secretary testified that she thought the talk about the Lexus was a joke.
Holley testified that he decided to try to obtain the patents in two phases. First, he said, he and the Pitts brothers would work on the patent for the land in section 35, and, then, if that patent request was successful, they would work on the patents for the land in sections 31 and 34. Holley explained that it was impossible to adversely possess against the State after May 1, 1908, [2] so, he said, he needed to find documentation of adverse possession by predecessors in interest to JWR-ULC from 1888 to 1908. Holley recounted the work that went into the first patent request, which included numerous hours of research in the Tuscaloosa County courthouse, trips to the State Highway Department to obtain old right-of-way maps, as well as trips to bankruptcy court and to the vault of ULC to obtain old records. Holley described the process of locating old legislative materials and attorney general's opinions in the library of the law school in Tuscaloosa and tracking down the successor entities to prior possessors of the property. Holley said that during their long hours working together he often heard the Pitts brothers refer to the "big bonus checks and cars" that, they said, they had been promised if they were successful in obtaining the patents.
On May 16, 1997, Holley applied to the State for the first patent, attaching all the documents that he and the Pitts brothers had amassed in support of the request. On September 22, 1997, the State issued the patent on section 35. State Lands Director James Griggs testified that it was the first time that anyone had ever been successful in obtaining a patent from the State after having previously been turned down. Holley testified that the issuance of the patent was the culmination of the "best legal work he had ever done." *Page 929 
On October 15, 1997, Spransy sent out a "good news" memo to the staff of JWR, ULC, and Walter Industries, thanking Holley and the Pitts brothers for their work on the project. Spransy instructed Holley to start work on the second patent request immediately, but neither of the Pitts brothers were contacted by anyone at JWR or ULC about working on the second patent.
In November 1997, Robin had a conversation with Spransy during which he mentioned that Rice had promised his brother and him new Lexus automobiles for successful completion of the patent requests. Spransy replied, "I wouldn't think Harold's authorized to make that kind of offer." Spransy testified that he later asked Rice, "What's this I hear about cars [for the Pitts brothers]?" and Rice responded, "Whatever it takes." When Spransy was asked whether he then informed Rice that Rice was not authorized to make such an offer, Spransy answered, "I backed away. I didn't respond [to Rice]. I backed away from it."
After Holley had been instructed to commence work on the second patent, he learned that the Pitts brothers had not been contacted to continue the work, so he wrote a letter to Rice and Spransy, explaining that the brothers' work had been "invaluable in our efforts to secure [the first] patent from the state" and stating that he expected to have the continued assistance of the brothers in seeking to obtain the second patent.
Ronald testified that he and Robin waited for a few days to see if they would be contacted by either Rice or Spransy to continue the work. Ronald said that when they did not get a call, he became upset because he thought Rice might be trying to "cut them out of the deal" for bonuses and cars — a deal that was contingent on their success in obtainingboth patents. Ronald went to see Rice and inquired whether Rice was trying to exclude him and his brother from working on the second patent in order to avoid giving them the "big bonus checks and cars."
Rice assured Ronald that he wanted the brothers to continue work on the second patent. Then, Ronald demanded that he and Robin be paid $100 per hour, what Holley was earning, rather than their usual "day rate" of $200 plus expenses, in addition to "their bonuses and cars." Rice testified that he considered Ronald's demand to be extortion, but he agreed to the increased pay rather than start over with new landmen who knew nothing about the project. Rice testified that Ronald's demand did not include any mention of "bonuses and cars," and he repeated his earlier testimony that he had never promised such bonuses.
The State issued the second patent in May 1998. The Pitts brothers tried to contact Rice about collecting their bonuses and cars, but Rice failed to return their telephone calls or answer their letters. Robin sued JWR, alleging breach-of-contract and fraud claims, in August 1999. Ronald sued JWR, alleging the same claims, in June 2001.
 Robin's Appeal
JWR moves us to dismiss Robin's appeal as being untimely. JWR argues that Robin's November 9, 2005, notice of appeal was filed more than 42 days after the entry of the judgment on July 26, 2005, and, it says, Robin did not file a post-judgment motion that would have suspended the running of the time for filing a notice of appeal pursuant to Rule 4(a)(3), Ala. R.App. P.
On August 25, 2005, Ronald filed a timely postjudgment motion in case number CV-2001-750, asserting that the trial court had erred by excluding evidence that, Ronald *Page 930 
claimed, was relevant to the measure of damages on the brothers' breach-of-contract claims. The trial court denied the postjudgment motion on September 29, 2005.
Apparently, the trial court treated Ronald's motion as a joint motion by both brothers and entered a ruling on the motion in each brother's case. Following a hearing on the postjudgment motion, the trial court rendered the following order on September 29, 2005.
 "ROBIN PITTS, Plaintiff,
 "v. CASE NO. CV-1999-1124
 "JIM WALTER RESOURCES, INC., Defendant;
 * * *
 "RONALD PITTS, Plaintiff,
 "v. CASE NO. CV-2001-750
 "JIM WALTER RESOURCES, Defendant.
 "ORDER
 "This cause was before the Court for hearing on the Motion for A New trial filed by plaintiff's
in the above-captioned consolidated cases.
 "Following oral arguments and upon consideration thereof, it is the order and judgment of the Court that the plaintiffs' Motion for a New Trial is due to be and is hereby DENIED."
(Emphasis added.) On September 29, 2005, the court entered a handwritten notation on the case action summary sheets for both case number CV-1999-1124 (Robin) and case number CV-2001-750 (Ronald) that it had "placed in [the] file" the order denying the "plaintiffs' motion for new trial." (Emphasis added.) Despite the language of the trial court's order, the record does not show that Robin filed any postjudgment motion in case number CV-1999-1124.
Our supreme court has recognized that the "running of the time for taking an appeal is tolled as to all parties, not just the one who filed the post-judgment motion." Wellcraft Marine,a Div. of Genmar Indus., Inc. v. Zarzour, 577 So.2d 414,417 (Ala. 1990). However, where "several actions are ordered to be consolidated for trial, each action retains its separate identity and thus requires the entry of a separate judgment."League v. McDonald, 355 So.2d 695, 697 (Ala. 1978), cited with approval by Solomon v. Liberty Nat'l Life Ins.Co., 953 So.2d 1211 (Ala. 2006).
 "Moreover, `[a]n order of consolidation does not merge the actions into a single [action], change the rights or the parties, or make those who are parties to one [action] parties to another.' Jerome A. Hoffman, Alabama Civil Procedure § 5.71 (2d ed. 2001) (citing Evers v. Link Enters., Inc., 386 So.2d 1177 (Ala.Civ.App. 1980)). Finally, `"in consolidated actions . . . the parties and pleadings in one action do not become parties and pleadings in the other."' Ex parte Flexible Prods. Co., 915 So.2d 34, 50 (Ala. 2005) (quoting Teague v. Motes, 57 Ala.App. 609, 613, 330 So.2d 434, 438 (Ala.Civ.App. 1976))."
Solomon, 953 So.2d at 1222 (emphasis added).
Robin contends that the trial court's order denying the postjudgment motion followed a hearing on September 26, 2005, at which both brothers, he says, appeared and argued the motion. Robin suggests that during the hearing he either adopted Ronald's postjudgment motion or made an oral postjudgment motion of his own. The hearing was not transcribed and is not a part of the record on appeal. However, even if we were to accept the factual basis for Robin's argument — that Robin could be *Page 931 
"deemed" to have moved for a new trial at the hearing on September 26, 2005 — we would have to conclude that such a motion was untimely because it was made more than 30 days after the entry of the July 26, 2005, judgment. Rule 59(b), Ala. R. Civ. P.
Citing Hanner v. Metro Bank Protective LifeInsurance Co., 952 So.2d 1056 (Ala. 2006), Robin argues that it would have been "premature" for him to have filed a notice of appeal while Ronald's post-judgment motion was still pending. We disagree; Hanner is inapplicable.
In Hanner, Pamela Hanner was a party in each of two consolidated cases; the trial court had entered a final judgment with respect to only one of the cases. When Pamela appealed from that judgment, the Alabama Supreme Court remanded the cause to the trial court in order to allow that court the opportunity to elect whether to enter a certification pursuant to Rule 54(b), Ala. R. Civ. P. The supreme court held that "a trial court must certify a judgment as final pursuant to Rule 54(b), Ala. R. Civ. P., before a judgment on fewer than all the claims in a consolidated action can be appealed."953 So.2d at 1222. In the present case, however, the trial court, in accordance with the jury verdict, entered two judgments on July 26, 2005 — one for Robin and one for Ronald — both of which were final and appealable.
We hold that Robin's notice of appeal was untimely; therefore, we grant JWR's motion to dismiss Robin's appeal.
 Evidentiary Issues Relating to the Contract Claim
Ronald argues that the damages awarded by the jury were inadequate because the trial court's evidentiary rulings prevented the jury from knowing the full extent of the damages that, Ronald claims, arose from JWR's breach of the contract. The brothers presented evidence indicating that JWR, through its agent Harold Rice, had promised them that if they obtained patents from the State on the title-defect properties, they would each receive a "big bonus" equal to 4% of the value of the properties, including all past revenues generated by the properties, and a new Lexus automobile. The brothers offered evidence tending to show the value of the 280 acres composing the title-defect properties, including the value of both surface rights and subsurface mineral rights.
The only proof of value admitted by the trial court, however, was testimony indicating that the value of the subsurface mineral rights on the property owned by JWR, specifically the gas wells on the property, ranged in value from $521,013 to $689,323. The damages awarded by the jury to each brother, $21,300, were equivalent to 4% of $532,500, a sum within that range. The trial court excluded evidence of value with regard to the surface rights of the property, including surface-mineable coal, timber, sand, and gravel. The trial court ruled that such evidence was irrelevant, and therefore inadmissible, because the surface rights were not owned by JWR but were owned by its sister corporation, ULC. For example, when the brothers attempted to introduce an appraisal done for ULC on June 30, 1994, on 80 acres that ULC owned in section 34, which was part of the 280-acre tract, placing a value of $88,000 on the surface rights, including raw land and timber, the following occurred:
 "MR. DONALD [Counsel for JWR]: I'm going to object to that. . . . [T]his is an appraisal being submitted [to ULC] who's a nonparty to this case. And this appraisal goes to properties not owned by the defendant in the case. And that's the basis of my objection. It's not relevant to the claim against [JWR].
 "THE COURT: What says the plaintiff? *Page 932 
 "MR. CORNWELL [Counsel for Robin]: Judge, it covers an 80-acre parcel of the 280 acres in question here where our clients claim they were promised a bonus based on the value, not based on ownership of the property. . . .
 "MR. DONALD: [JWR], though, didn't [request] the appraisal and . . . [JWR's] ownership is confined to two underground [coal] seams, not surface mining coal. And they do not own the timber or the sand and gravel. That's owned by [ULC].
 "MR. PRADAT [Counsel for Ronald]: The contract that we claim here today was not based on who owned what. It was based on the total value of the land. That's what's been testified to. . . .
 ". . . .
 "THE COURT: All right. The Court is going to sustain the objection."
In other colloquies with the court concerning the admissibility of evidence relating to the value of the surface rights, the brothers repeated the assertion that their claims were derived from a contract that was based on the value of the land, not on the ownership of the land. The trial court excluded as irrelevant all evidence that tended to show the value of property owned by ULC — solely because the propertywas owned by ULC. In doing so, the trial court erred.
We know of no rule of law that restricts how the consideration necessary to support a contract must be expressed by the parties to the contract. "[I]t is of no consequence whether the agreed consideration [is] expressed in terms of cash or of some equivalent in property or other element." Williams v.Kilpatrick, 195 Ala. 563, 566, 70 So. 742, 743 (1916).See, e.g., RMC Assocs., Inc. v. Beasley,958 So.2d 879, 880 (Ala.Civ.App. 2006) (quoting § 8-24-1, Ala. Code 1975) (recognizing that a commission is "`[c]ompensation accruing to a sales representative for payment by a principal, the rate which is expressed as a percentage of the dollar amount of certain orders or sales'"); Young v.State, 469 So.2d 683, 688 (Ala.Crim.App. 1985) (stating that payment for an informant hired by the sheriff's department to investigate illegal drug traffic was expressed as 25% of the value of any property confiscated); Nations v. DowntowmDev. Auth. of Atlanta, 256 Ga. 158, 159, 345 S.E.2d 581,583 (1986) (upholding an intergovernmental contract in which the consideration was expressed in terms of "an amount equal to the debt service on the bonds issued"); State Dep't ofMotor Vehicles Public Safety v. Hutchings,106 Nev. 453, 457, 795 P.2d 497, 500 (1990) (citing a statute that prohibited any state employee other than a dentist, physician, or University of Nevada employee from being paid a salary which exceeds "95 percent of the governor's salary"); Eagle v.Star-Kist Foods, Inc., 812 F.2d 538 (9th Cir. 1987) (noting that the wages of fishing-vessel crew members were tied to the value of their catch); Gatz v. Ponsoldt,271 F.Supp.2d 1143, 1149 (D.Neb. 2003) (stating that an employment agreement provided that annual adjustments to the salary of the chief executive officer were tied to the enhancement of the corporation's net worth); and In re J.P. Morgan ChaseSec. Litig., 363 F.Supp.2d 595, 622 (S.D.N.Y. 2005) (recognizing that employee bonuses were tied to the value of stock).
In the present case, the jury heard evidence indicating that JWR, the promisor, contracted to pay the brothers, the promisees, a bonus, expressed in terms of the value of property that was only partly owned by JWR. The brothers claimed that JWR breached the contract but that, in establishing that they were damaged by the breach, they were erroneously restricted by the trial court to showing only the *Page 933 
value of property owned by JWR. We hold that the trial court erred by limiting the evidence of damages to the value of property owned by JWR.
Before trial, the trial court entered what it termed a "partial summary judgment" in favor of JWR, holding that "to the extent that [the brothers] are making a claim for a percentage interest in future mineral royalties [or] minerals in the ground," their claims were barred by the Statute of Frauds because their contract with JWR was not in writing. The Statute of Frauds provides, in pertinent part:
 "In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing:
 ". . . .
 "(5) Every contract for the sale of lands, tenements or hereditaments, or of any interest therein, except leases for a term not longer than one year, unless the purchase money, or a portion thereof is paid and the purchaser is put in possession of the land by the seller."
§ 8-9-2, Ala. Code 1975.
At trial, the brothers made an offer to prove, through the testimony of JWR's accountant and certain documentary evidence, that after JWR had entered into a contract in February 1997 to pay the brothers a bonus equal to 4% of the value of the property, JWR received royalties, from November 1998 through the date of trial, totaling $711,323.35 from the gas wells on the property. JWR objected, stating that an oral agreement as to future royalty interests in mineral rights could not be shown without violating the Statute of Frauds. JWR also objected to the offered documentary evidence on the ground that it was hearsay and that it had not been authenticated. The brothers responded:
 "We [do] not contend that we [are] entitled . . . to any royalty interest. We are entitled to value. We contend that this is merely a tool by which a value can be assigned to the property."
The trial court sustained the objection, ruling that the proposed evidence was barred by the Statute of Frauds. The court specifically stated that it was not ruling on
 "whether or not the foundation for admissibility of the testimony has been made inasmuch as counsel for the [brothers] haven't made an attempt to establish the foundation but have addressed whether or not these matters would be admissible even if the foundation was established."
Ronald contends that, even if an agreement to transfer a royalty interest in mineral rights is within the Statute of Frauds, the offer of proof was not barred by the Statute of Frauds because he was not promised — and he was not seeking — a royalty interest or a mineral interest in the property. Instead, citing DeMoville v. Merchants Farmers Bank of Greene County, 233 Ala. 204, 170 So. 756
(1936), Ronald argues that he was seeking to establish the future earnings from the land as one indicator of the land's value. In DeMoville, a depression-era case, the supreme court held:
 "The yardstick of `reasonable market value' fixed by the law in a proper case for the purpose of ascertaining values, by courts and juries, presupposes a market for the class of property, the subject-matter of the litigation, and where there is no market at the time for such property, other elements are to be taken *Page 934 
into consideration, such as the original costs, the costs of the buildings or improvements, rents, the adaptability for future use and enjoyment, and the opinion of witnesses in a position to have a correct judgment as to the values."
233 Ala. at 210-11, 170 So. at 761 (emphasis added). Unlike the property at issue in DeMoville, there is, presumably, a market for the real property at issue in this case. Accordingly, the proper way to establish the value of the property is to prove, through a competent witness, its fair market value — one component of which would undoubtedly be its revenue-generating potential.
We hold that the evidence that was the subject of Ronald's offer of proof did not violate the Statute of Frauds. Although the fair market value of real property is "`the criterion by which actual damages for its destruction or loss may be fixed,'" Lary v. Gardener, 908 So.2d 955, 960
(Ala.Civ.App. 2005) (quoting Southern Express Co. v. Owens,146 Ala. 412, 426, 41 So. 752, 755 (1906)), we cannot hold that evidence concerning the revenue generated by the property at issue in this case was irrelevant. Consequently, we conclude that the trial court erred in excluding the evidence. We express no opinion as to whether the evidence that Ronald attempted to introduce would be subject to objections based on hearsay or lack of authentication.
 Conclusion
The trial court erroneously excluded relevant evidence relating to the value of the property that was the yardstick for the consideration expressed in the parties' contract. The trial court's evidentiary rulings injuriously affected Ronald's substantial right to have the jury apprised of the full measure of damages on his breach-of-contract claim. Rule 45, Ala. R.App. P. Therefore, Ronald is entitled to a new trial.
Robin's appeal from the judgment in case number CV-1999-1124 is dismissed. The judgment in favor of Ronald in case number in CV-2001-750 is reversed, and the cause is remanded for a new trial.
APPEAL IN CASE NUMBER CV-1999-1124 DISMISSED; JUDGMENT IN CASE NUMBER CV-2001-750 REVERSED AND REMANDED.
PITTMAN, THOMAS, and MOORE, JJ., concur.
THOMPSON, P.J., and BRYAN, J., concur in the result, without writing.
[1] The record does not indicate the full name or legal nature of this entity.
[2] See State v. Inman, 239 Ala. 348, 195 So. 448
(1940) (holding that, for 20 years prior to May 1, 1908 (the effective date of § 4830, Ala. Code 1907), adverse possession ran against the State of Alabama on internal improvement lands granted under an act of Congress).