50 So.2d 760

STATE DEPARTMENT OF REVENUE v. BIRMINGHAM REALTY CO.

6 Div. 885.

Supreme Court of Alabama.

Jan. 18, 1951.

Rehearing Denied March 1, 1951.

A. A. Carmichael, Atty. Gen., and H. Grady Tiller, Asst. Atty. Gen., for appellant.

Smyer & Smyer, of Birmingham, for appellee.

BROWN, Justice.

On September 22, 1947, the State Department of Revenue, following the formula laid down in § 25, Title 51, Code of 1940, fixed the value of all the stock of the Birmingham Realty Company, as a basis for taxation at $2,563,114, this sum being 60 percent of the total value of said stock, which was ascertained to be $4,271,858 and deducted from the first mentioned amount the assessed value of its real and personal property ascertained to be $2,194,959, leaving a taxable residue of $368,155.

The taxpayer feeling itself aggrieved by this assessment appealed to the circuit court of Jefferson County as authorized by § 140, Title 51, Code of 1940, and in pursuance of such appeal filed its bill therein praying that said assessment be re-examined and that the court assess said shares of stock "at the value provided for under § 25, Title 51, of the Code of Alabama of 1940" and in its bill offers to do equity. The State Department of Revenue in compliance with § 141, Title 51, Code of 1940, filed in said case a transcript of the record and proceedings of the State Department of Revenue touching said assessment duly certified by the secretary of said department.

The bill alleges in paragraph one thereof the fact of said assessment as above stated and in paragraph two "avers that the total assessed value of the shares of stock * * * and the residue and value of the shares of stock * * * as made * * * is excessive and exceeds 60% of its value."

To the bill as thus filed the state through its attorney general filed an answer admitting the facts of such assessment as alleged in paragraph one and referred to and made a part of the answer the transcript of the proceedings before the department of revenue filed in the circuit court, alleging that the assessment made and entered by the board of equalization of Jefferson County, Alabama, was appealed by the taxpayer to the circuit court and the court entered a decree fixing the value of the real estate and personal property at $1,988,604 instead of $2,194,959, the value fixed by said Board of Equalization, thus reducing the assessed value of said real estate and personal property by $206,355; that, as a result the residual value of the stock was increased by $206,355, making the total amount of the residual value $584,199. That the appellee has been advised and informed and upon such advice and information alleges *that there was other and additional intangible* personal property owned by said taxpayer as of October 1, 1946, which had a reasonable and fair market value of, towit: $500,000, which had not been included in the total value of said shares and that sixty percent of said additional sum of $500,000 should be added to the residue value of the stock of said corporation for taxation, thus making a total of residual value for all of said shares of stock for taxation the sum of, towit: $884,199, instead of the sum of $368,155, as originally fixed and determined by the Department of Revenue.

"Answering paragraph two of said bill of complaint, appellee denies each and every allegation of said paragraph; appellee specifically denies 'that the assessed value of the shares of stock of said appellant and the residue assessed value of the shares of stock, * * * is excessive and exceeds sixty percent of its value'; but, on the contrary, appellee would respectfully allege and show that the assessment as made by the Department of Revenue against the appellant was greatly less than sixty percent of the reasonable and fair market value of said shares of stock, after deducting from the total value thereof the assessed value of all the real and personal property as fixed by the Court to said corporation for taxation for the said year 1947.

"That the total residual value of said stock should have been assessed in the above sum of, towit: $884,199.00; and the appellee further specifically denies 'that said

assessment exceeds the amount authorized. to be assessed under Chapter 5 of Title 51 of the 1940 Code of Alabama,' but, on the contrary, specifically alleges that said assessment was, as stated hereinabove, far less than the taxes levied by Sections 25, et seq., Title 51, Code of Alabama, 1940, and that said residual assessment of said shares of stock should by this Court be fixed and determined to be the said sum of, towit: $884,199.00."

Paragraph three of the answer admits that all necessary steps to perfect the appeal to the circuit court were had, and concludes with a prayer that this answer be taken and considered by the court as a "cross bill and that, on the final hearing of this cause, a decree be made and entered by the Court assessing the residual value of all the shares of stock of said corporation for ad valorem taxation at the sum of, towit: $884,199.00, or such other sum as the Court may ascertain from the evidence in the case to be sixty percent of the reasonable and fair market value thereof."

Upon the issues formed by the pleadings stated above, the burden was on the taxpayer in the circuit court "to show that such assessment is incorrect." The assessment made by the department of revenue, the proceedings of which were filed in the court, under § 141, Title 51, Code of 1940, is presumptively correct and made a prima facie case. Code of 1940, Tit. 51, § 140.

The state offered in evidence the record of the proceedings of the department of revenue duly certified by its secretary and filed in the circuit court as required by § 141, Title 51, Code of 1940 and rested. The taxpayer then offered documentary evidence and testimony given *ore tenus* showing factors of value touching its common stock. A resume of this testimony will now be stated.

The evidence is without dispute that the Birmingham Realty Company was incorporated on December 16, 1899, with its principal place of business in the City of Birmingham, Jefferson County, Alabama,—a great industrial district,—and has continued in business through the years for a half a century on a cash basis. The evidence further shows that said corporation is and has been officered and managed by business men of ability, some of whom have been active in the organization for as much as 30 years or more. The corporation has outstanding 12,996 shares of common stock par value of $100 each on which it has for many years paid a dividend of 4% on the par value. The Department of Revenue on the form which the taxpayer made its tax return asked: "State the fair and reasonable cash value of each share of stock." Its secretary who made the return answered: "See financial statement attached." By reference to such financial statement embodied in the record, it is shown that on October 1, 1946, the beginning of the tax year, the taxpayer had on deposit in bank $202,240.30; that it had notes receivable of $710,645.13; that it had on deposit in banks outside the state $10,262.50; that it had stock in the Woodward Iron Company, a foreign corporation, the par value of which was $2,100; that it had United States Treasury Bonds in the amount of $402,781.25; that it owned stock in the Dolcito Quarry Company of the par value of $1,400; that it had accounts receivable totalling $1,833.67; that it had real estate of the value of $3,802,693.03; that it had automobiles, tools, etc., of the value of $834.99, making a total of $5,134,-790.87.

On the balance sheet is listed under the heading "liabilities" as follows: Common stock $1,300,000.00; Reserve for depreciation, $630,476.30; Fire loss, $230.87; and Profit and Loss Account, $3,204,083.70, or a grand total of $5,134,790.87.

The form of tax return used by the taxpayer called for the "value of the shares as shown by the last report of the officers to the shareholders". This inquiry was not answered but said report was produced and put in evidence on the trial. It recites: "Below is given a statement of the condition of the Company at the close of business March 31, 1947," showing assets at that date of $5,187,110.90, or an increase of $50,000, over the assets as stated in the return to the Department of Revenue as of October 1, 1946. Said report made by the

president of the corporation to the stockholders embodied the following statement:

"Your company received checks from the Internal Revenue Department of the United States and of the State of Alabama aggregating $19,918.49 refund of taxes and interest thereon during the year.

"Real Estate Sales, amounting to $139,-000, were made for the fiscal period and all of this property was for use by the buyers, it having been the policy of the Company to decline to sell except to users. Due to the prohibitive cost of construction of all classes, prospective home builders have been unable to go ahead with their plans and it is felt that until some way is found whereby the cost of building can be materially reduced, your Company sales of residential property will be almost completely prohibited. In the report for the year ending March 31, 1946, reference was made to a sale to Daniel Construction Company. The thirty houses were constructed, completed and sold but the Construction Company and your Company were so dissatisfied with the high prices that had to be charged for the completed units that neither company was, or are, willing to construct more.

"The two story reinforced concrete warehouse on First Avenue, between Fifteenth and Sixteenth Streets, was completed in November, 1946, and leased to Sears-Roebuck and Company on a fifteen year lease on terms that were entirely satisfactory to both landlord and tenant.

"Due to the construction of the two rental units, the adjustment of rentals on existing buildings and the additional leasing of vacant lands, the rental income of the Company increased $39,434.73 per annum, or 20% over the previous year. The rental on vacant ground is now $25,000 per annum.

"After much negotiating and effort, a track has been constructed by the Louisville and Nashville Railroad in Fifth Alley from Thirty-third to Thirty-first Streets. This tract will be accessible to service by the Belt Line Railroad, the Seaboard Airline, the Illinois Central Railroad, along with the Louisville and Nashville Railroad. The arrangement provides for the construction of similar tracks in Sixth and Seventh Alleys and when installed will give your Company approximately five thousand feet of splendid warehouse property, served by these four lines of railroad and located close to the heart of the City. It is felt that with reasonable costs of construction, several warehouses would have been under construction, by this time. An agreement has been made and negotiations of formal contract for the construction of similar tracks in the alleys in the southeastern section of your Company's property, which will likewise provide some five thousand front feet of high class warehouse property.

"The installation of the belt conveyor at the Quarry has been completed and its installation has been fully justified. There are minor adjustments still being made and with their completion the output from the Quarry will be very materially increased. The demand for stone of all sizes is extremely heavy, particularly with respect to agricultural limestone. The high percentage of magnesium has come to be recognized as giving much agricultural value to Dolcito stone as against any other stone produced in the Southeastern states. During the year stone has been shipped into ten of the Southeastern states and it is significant that the heaviest demand for your Company's agricultural stone comes from the states developing a live stock industry.

"Regular dividends of 4% were paid during the year.

"Respectfully submitted,
"I. C. Beatty, President."

This report shows much optimism. That the taxpayer's rentals had increased for the year $39,434.73, or 20% above the previous fiscal year and that some of its vacant property was yielding rentals of $25,000. per annum.

The evidence further shows that the taxpayer owned and operated through its official staff the said "Dolcito Quarry Company". That the output by the quarry was materially increased by the installation of a belt conveyor; that the demand for limestone of all sizes was heavy, particularly crushed agricultural limestone and that such limestone was purchased and shipped into

10 of the southern states wherein the live-stock industry was being developed.

The taxpayer's witness Arnold, a certified public accountant, testified that he was familiar with its books and records; that he had prepared the federal income tax returns since 1943 or 1944; that he had recently made a survey of the net profits and surplus for the period of March 31, 1943; that for the fiscal year 1942 the profit was $41,518.-62; that for the year 1943 it was $81,006.75; that the year 1944 there was a loss of $97,-782.69; that for the year 1945 there was a profit of $44,453.15; that for the year 1946 there was a profit of $40,619.50; that over the six year period including 1947 there was decrease in surplus of $57,535.69. The evidence shows that the foregoing data was taken from the taxpayer's federal income tax returns and there is an absence of evidence as to exemptions allowed such as dividends and interest allowable on United States Securities. This witness further testified that the taxpayer's surplus as of March 31, 1946 was $3,068,860. Yet the report furnished by the taxpayer to its stockholders as of that date shows a surplus of $3,072,351.30. This witness further testified that the surplus as of March 31, 1947 was $3,161,428.80, whereas in the taxpayer's report to its stockholders of that date it was $3,225,040.14.

The witness Arnold further testified that he was not capable of valuing real estate; that he gave no weight to such value in his testimony on his direct examination; that his answers were based on the earnings of the company and what the stockholders had drawn out of it.

The testimony shows the Birmingham Realty Company is a close corporation and that its stocks had never been traded on the New York Stock Exchange. The witness Sterne, a member of the firm of Sterne, Agee & Leach, investment bankers, testified that he had purchased and sold some of said stock and was asked by the counsel for the complainant the following question, "Q. Looking at the sale price of Birmingham Realty Company stock for a period of five years prior to October 1, 1947, what was the value?" The state objected to the question on the ground that the sales for five years prior to that time would not reflect value as of October 1, 1946. The objection was overruled by the court and the witness testified: "That he had bought stock during that period at a minimum of 105 and a maximum of 147½; that he hadn't a memorandum on it. It was 148½, 149½, or 150." In answering the question as to how many shares he bought or sold he stated: "November 2, 1942, 1 share; December, 1942, 7 shares; April, 1943, 27 shares; October, 1943, 5 shares; November, 14 shares; March, 1944, 22 shares; June, 2 shares; July, 18 shares; September, 38 shares; November, 2 shares; June, 1945, 4 shares; October, 50 shares; December, 17 shares; August, 1946, 6 shares; November, 25 shares; January, 1947, 7 shares; February, 38 shares; May, 12 shares; June, 6½ shares; and September, 2 shares." Continuing this witness stated: "I think that the transactions we handled represented most of the transactions that took place in the stock market. I have no record of what other people sold, but I think we handled most of the stock sold."

On cross examination Mr. Sterne testified substantially as follows: That during the five year period testified about he sold only 302½ shares; that the five years he testified about were the five years before October 1, 1947; that he went beyond October 1, 1946, both ways; that 65½ shares were sold in 1947; that only 31 shares were sold in 1946; that he did not know who sold those shares to his company and that he had no recollection of who bought them; that he had a record of who bought the shares and their addresses and that he had a record of who sold the shares and their addresses; that he was acting as a dealer. Here the court on objection of the taxpayer declined to require Mr. Sterne to furnish the reporter the names and addresses of the persons who sold the shares and the names and addresses of the persons who purchased the shares and to which action of the court the state excepted. That he sold ten shares on November 16, 1946, for 146½ per share. That on November 2, 1942, he sold one share at 105 per share.

The appellee's witness Smyer testified in substance that on October 25, 1946, he pur-

chased 5 shares of the Birmingham Realty Company at $147 per share; that on December 12, 1946, he purchased 24 shares at $150 per share; that on February 2, 1947, he purchased 3 shares at $147.50 per share; and on March 10, 1947, he purchased 4 shares at $150 per share; that he purchased the 24 shares from Steiner-Rouse; that he purchased 5 shares of the Birmingham Realty Company stock from Coates and Company; that the shares he bought on March 10, 1947 were from Jimmy Hendrix; that the company furnished the stockholders a financial statement for the years 1946 and 1947; that he is the vice president and a director in the company, that said annual statement is of record.

The appellee's witness Jones testified in substance that he is the secretary and treasurer of the taxpayer company; that from 1942 to 1946 it paid dividends of 4% on the shares of common stock, $4 per share; that in 1942, *838 shares were transferred* on the books of the company and in 1943, *2,198 shares were transferred* and in 1946, 415 shares. That no one person owns a majority of the stock of the company. That six named persons owned a majority of the stock, all non-residents except one. The evidence further shows that title to some of the stock passed by will. This witness further testified that the balance sheet of the Dolcito Quarry Company shows liabilities for rent account that has accumulated owing to the taxpayer in the amount of $727,240. There was no testimony showing the circumstances under which the sales of stock testified to by the witnesses Sterne and Smyer were made.

There was much more testimony showing factors of value touching the value of said common stock. The evidence shows that there was nothing in the corporate structure except common stock; nothing preferred.

We deem the foregoing sufficient to present the questions to be decided.

On submission, on pleading and proof, the learned trial court accompanied his decree with an opinion, which after stating applicable principles of law, concluded his opinion basing the decree on the testimony showing the sales of stock as testified to by witnesses Sterne and Smyer, the substance of which we have heretofore stated. After reciting the substance of the said testimony of these two witnesses, the opinion concluded by as follows: "From aught appearing all of these sales were voluntary, made in an open competitive market and from regular stock dealers who purchased and sold for their own account and for the account of others. Moreover, they were made in the area of the home office of the Company and from aught appearing there was no depressed or distressed market. From this evidence the Court is of the opinion that a fair and reasonable market price has been established and that as of October 1, 1946, the highest price at which said shares of stock could have been sold by the owner at a fair and voluntary sales was $150.00 per share. It is, therefore,

"Ordered, adjudged and decreed by the Court that the fair and reasonable market value of the holders of the shares of capital stock in the Birmingham Realty Company, a corporation, as of October 1, 1946, be and the same is hereby fixed at $150.00 per share."

It is pertinent to here point out that the value placed on the stock of this corporation by the trial court of $1,949,400 is considerably less than the agreed value of its real estate alone. Moreover, the earnings per share of stock for the year ending March 31, 1947, were $11.12. This represents a return of over 7% on such decreed valuation. These earnings also show a marked increase over previous years, indicating favorable future prospects for the corporation.

It is also pertinent to note that the evidence of the appellee corporation's book value of assets, together with the evidence of its earnings per share of stock; its future prospects as indicated by the corporation's report to its stockholders; the absence of preferred stocks and bonds in the corporate structure; and all other relevant facts, as balanced against a consideration of the limited number of sales of this stock, preponderates in favor of the assessment made by the Department of Revenue.

The term "market value," as the words fairly import, indicates price established in a market where the article is dealt in by such a multitude of persons, and such a large number of transactions, as to standardize the price. Proof of such a market value can only be made by one of the recognized methods of proving the price current in a market. A limited number of private individual dealings are not sufficient in themselves to establish a reasonable market value—that is, such a value as the property would have if it were dealt in according to the practices of a market overt. Evidence of all factors of value is admissible to show the fair and reasonable value of property which is not so traded in as to give it a market value in the primary sense of the term, but a limited number of sales in dealings between a few individuals is not sufficient to overcome the presumptive correctness of the assessment of the value of the stock by the Department of Revenue. Code 1940, Tit. 51, § 140; State v. Pullman-Standard Car Mfg. Co., 235 Ala. 493, 502, 179 So. 541, 117 A.L.R. 498; Helvering v. Kendrick Coal & Dock Co., 8 Cir., 72 F.2d 330; North American Telegraph Co. v. N. P. Ry. Co., 8 Cir., 254 F. 417. See also DeMoville v. Merchants & Farmers Bank, 233 Ala. 204, 170 So. 756; Haney v. Ray, 253 Ala. 224, 43 So.2d. 889.

In State v. West Point Mfg. Co., 236 Ala. 467, 183 So. 449, 451, it was observed: "The fair and reasonable market value is not to be determined from any one item of evidence, but from the composite relevant facts. Heiner v. Crosby, 3 Cir., 24 F.2d 191; Greensburg Deposit Bank v. Commonwealth et al., 230 Ky. 798, 20 S.W.2d 979."

In First National Bank of Estherville v. City Council of Estherville, 136 Iowa 203, 112 N.W. 829, 832, it was said: "Where, however, a commodity is not regularly on the market, proof of value, where in issue, must come from original sources. * * * And in this view it is not possible that there should be any fixed or arbitrary standard for the ascertainment of values. So it is that in respect of any particular item, or class of items, of property, all those things which from any cause inhere in or attach to the same, and which contribute in any degree to its desirability, are always taken into account in arriving at a conclusion. Indeed, it is not conceivable that the question of value could be determined adequately in any other way. And from this it follows that in estimating the value of stock in a bank or other corporation every fact condition having effect to influence or control must be considered."

And in Greensburg Deposit Bank v. Commonwealth, 230 Ky. 798, 20 S.W.2d 979, 980, the court used the following language: "The fair cash value of the shares of stock is the matter to be determined on all the facts. The price at which a share or so now and then was sold at private sale is not conclusive."

In the absence of testimony going to show that said sales of stock were made on an open market, there was no basis for the assumption indulged by the trial court. The statute put the burden of proof on the taxpayer to overcome the presumption of correctness of the assessment made by the department. Code of 1940, Tit. 51, § 25.

The taxpayer admits, by agreement, that the real estate owned by the company should be assessed at 60% of $3,012,990. This is exclusive of the real estate assessed by the company but owned by others and assessed at 60% of $300,350.

It appears without dispute that it had cash in Birmingham and New York banks totaling $212,502. It owned government bonds valued at $402,781, exclusive of accrued interest. It owned sundry notes and mortgages in the amount of $201,242, secured by real estate assessed at 60% of $300,350, and it owned all of the stock and liabilities of Dolcito Quarry Company except $18,723.07. In addition it owned $2800 worth of Woodward Iron Company stock and some other sundry items.

The company owed no debts.

Therefore, summarizing, we find that on a conservative liquidation the stockholders would receive:

| | |
|---|---|
| Cash | $ 212,502 |
| Government bonds | 402,781 |
| Notes and mortgages | 201,242 |
| Net assets of Dolcito Quarry Co.—on basis of conservative estimate (note testimony as to earnings) | 375,000 |
| Woodward Iron Co. stock | 2,800 |
| Sundry assets | 1,300 |
| Total assets other than owned real estate | $1,195,625 |
| Real estate at 100% of assessed value | $3,012,990 |
| Net value of all shares | $4,208,615. |

There using these figures the assessment would take the following form:

| | |
|---|---|
| Total value of all shares of stock remaining for assessment | $4,208,615 |
| 60% of the above total value of shares of stock for assessment | 2,525,169 |
| Less the assessed value of real and personal property as finally determined | 1,808,394 |
| Residue of total value of shares remaining for assessment | $ 716,775 |

From all the evidence and general information available, any valuation below $4,500,000 is not excessive.

█. We are, therefore, of the opinion that the taxpayer failed in the circuit court to meet the burden of proof imposed on it by the statute to overturn the prima facie correctness of the assessment made by the Department of Revenue. The decree of the circuit court is, therefore, reversed and one will be here rendered reinstating and confirming the assessment of said stock as fixed by the Department of Revenue.

Let the appellee pay the costs incurred in the circuit court and the costs of appeal.

Reversed and rendered.

All the Justices concur except GARDNER, C. J., not sitting.