874 So.2d 532 (2002)
James OFFENBECHER
v.
BARON SERVICES, INC.
2000025.
Court of Civil Appeals of Alabama.
May 10, 2002.
*533 S. Mitchell Howie, Huntsville, for appellant.
Frank McRight of Lanier Ford Shaver & Payne, P.C., Huntsville, for appellee.

On Application for Rehearing
MURDOCK, Judge.
This court's opinion of May 18, 2001, is withdrawn, and the following is substituted therefor.
Baron Services, Inc., acting pursuant to § 10-2B-13.30, Ala.Code 1975, sued James Offenbecher, one of its minority shareholders, seeking a determination of the fair value of Offenbecher's stock. Baron Services paid $72,488.49, its estimate of the value of Offenbecher's 130 shares of Baron Services stock, into the court. After the parties had conducted discovery, the trial court conducted a nonjury trial. On April 13, 2000, the court entered a judgment in favor of Baron Services, directing Offenbecher to deliver his shares to Baron Services in exchange for the funds Baron Services had paid into the court. Offenbecher filed a postjudgment motion pursuant to Rule 59, Ala. R. Civ. P. Baron Services moved for an award of an attorney fee. The trial court denied both motions. Offenbecher appealed to the Supreme Court of Alabama, which transferred the appeal to this court, pursuant to § 12-2-7(6), Ala.Code 1975.
On appeal, Offenbecher argues that the court erred in its determination of the number of outstanding shares of Baron Services stock and in failing to award him an attorney fee. Offenbecher also challenges the propriety of the court's use of a 50 percent marketability discount in calculating the fair value of the stock of Baron Services.
The record reveals that Baron Services was incorporated in 1990 by Bob Baron; the company sold weather-radar systems and related software. In 1990, Bob Baron gave Offenbecher, who had designed some software for Baron Services, 130 shares of Baron Services stock. Baron Services made no profit in its first few years of operation, selling only 10 radar systems. Baron Services earned profits of $59,847 in 1994; $22,480 in 1995; and $165,434 in 1996. However, in 1997, Baron Services sold 23 radar systems, and its profits soared to $735,261.
On March 31, 1998, the board of directors of Baron Services, which was controlled by its majority shareholders, approved a plan to merge Baron Services into a separate Delaware corporation.[1] The Baron Services board's merger plan included a "cash-out" provision providing for a cash payment to any shareholder owning fewer than 150 shares of Baron Services, while denying such shareholder any ownership stake in the Delaware corporation after the merger. In response to *534 the merger proposal, Offenbecher demanded payment from Baron Services for the fair value of his 130 shares of stock in that company. The parties' subsequent disagreements concerning the value of his ownership stake (both monetarily and in relation to the total outstanding shareholders' equity), resulted in the instant litigation.
Offenbecher argues, without any citation to authority, that the trial court erred in determining the number of Baron Services shares that were outstanding. In 1991, Baron Services issued 2,000 shares of stock to Oakley Baron, Bob Baron's father. Baron Services presented evidence, including stock certificates, indicating that Oakley Baron purchased the 2,000 shares of stock for $20,000. Offenbecher argues that Oakley Baron actually lent Baron Services $20,000 and that Baron Services improperly issued the shares of stock to him. In support of his argument, Offenbecher points to a letter from Oakley Baron to Bob Baron; the letter stated that Bob Baron could repurchase the stock when he had the money to do so. Offenbecher argues that Oakley Baron's letter clearly indicates that the 1991 transaction was a loan from Oakley Baron to Baron Services. Oakley Baron testified to the contrary, stating that he purchased stock in his son's company and that he was willing to resell that stock to his son. The resolution of this conflicting evidence was a factual issue to be determined by the trial court. Where the trial court is presented with ore tenus evidence, its judgment based on its factual findings is entitled to a presumption of correctness on appeal. Gray v. Reynolds, 553 So.2d 79 (Ala.1989); Martin v. Dinmark, 531 So.2d 1234 (Ala.Civ.App.1988). Offenbecher's brief on this issue does not contain any citations to the record or direct this court to any supporting authority. We conclude that Offenbecher has failed to demonstrate that the trial court erred in determining the number of outstanding shares of Baron Services stock.
Offenbecher also argues that the trial court erred, as a matter of law, in accepting a valuation of the fair value of individual shares of Baron Services stock ($547.77)[2] that included a 50 percent "marketability discount." We note that questions of law are not subject to the ore tenus presumption of correctness. Walker v. Walker, 695 So.2d 58 (Ala.Civ.App.1997).
In entering its judgment, the trial court relied heavily upon the testimony of Gary Saliba, the valuation expert retained by Baron Services. Saliba opined that Baron Services stock as of December 31, 1997, was worth $562.47 per share. In doing so, Saliba initially determined a value of $1,124.94 per share, which he called the "marketable value" of the stock, or the value of each share of stock "on a freely traded basis."[3]
*535 However, Saliba testified that a 50% "marketability discount" should apply to all the shares of stock for the company; Saliba testified that the marketability discount adjusted for the fact that the company was closely held and was not publicly traded. Saliba's calculation of the value of the Baron Services stock using the marketability discount resulted in a valuation of $562.47 per share as of December 31, 1997. At the request of Baron Services, Saliba later reevaluated the value of the stock, based on management's revised sales and income projections. Saliba's revised valuation indicated a stock value of $547.77 per share, as of December 31, 1997.
In contrast, Bruce Williams, Offenbecher's valuation expert, valued Offenbecher's 130 shares of Baron Services stock, as of April 19, 1998, at $215,000, or $1,653.85 per share. While Williams's opinion was based upon several different valuation assumptions than those made by Saliba, the principal reason for the wide gap between Williams's stock valuation and Saliba's stemmed from Williams's view that the instant case was an inappropriate one for the application of a marketability discount.
Under § 10-2B-13.02(a), Ala.Code 1975 (a portion of the Revised Model Business Corporation Act, or "BCA," as adopted by the Alabama Legislature), a shareholder of a corporation, such as Offenbecher, "is entitled to dissent from, and obtain payment of the fair value of his or her shares in the event of" (emphasis added), certain corporate actions, including mergers such as that undertaken by Baron Services. Under Alabama law, if the corporation's offer of payment is less than what the shareholder believes is the fair value of his or her shares and the corporation wishes to contest the validity of the shareholder's payment demand, the corporation may institute a civil action in which the trial court will enter a "judgment for the amount the court finds to be the fair value of his or her shares, plus accrued interest." Ala.Code 1975, § 10-2B-13.30(f) (emphasis added); see also §§ 10-2B-13.25 and -13.28. Such a statutory right to receive the "fair value" of one's shareholder interest provides a remedy for actual or threatened oppression of minority shareholders, as one commentator notes:
"Minority shareholders are granted limited statutory rights as a check against rampant majority rule. One such right is the ability of shareholders to dissent from certain corporate actions, primarily mergers and other fundamental corporate changes, and to receive the appraised fair value of their shares. This is sometimes known as the dissent and appraisal remedy, dissenters' rights, or, simply, the appraisal remedy....
". . . .
"... Most of the current appraisal litigation involves cash-out mergers, often instituted by a controlling shareholder. The appraisal remedy today serves a minority shareholder protection role, sometimes providing liquidity to shareholders, but most often operating to protect minority shareholders who are cashed out of their investment. The *536 remedy fulfills this function ex ante, deterring insiders from engaging in wrongful transactions, and ex post, providing a remedy to minority shareholders who are subjected to such transactions."
Barry M. Wertheimer, The Shareholders' Appraisal Remedy and How Courts Determine Fair Value, 47 Duke L.J. 613, 613-16 (1998) (footnotes omitted).
What is the "fair value" of a dissenting stockholder's shares? Ala.Code 1975, § 10-2B-13.01(4), defines it as "the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable." As to the stock of a company that is not publicly traded, "fair value" and "fair market value" are two different things:
"The distinction between the market value of a company as measured by its stock price and the intrinsic value of the company is well known. Nowhere does the [Illinois Business Corporation Act (`BCA')] state that dissenting shareholders are entitled to only the discounted, `market value' of their stock as of the date of the challenged transaction....
"Moreover, the equitable considerations implicit in [choosing] `fair' value as the measure of what dissenting shareholders are entitled to receive for their stock favor an undiscounted measure of stock value. First, the appraisal remedy is designed to protect minority shareholders from the greater risk of oppression by controlling shareholders posed by the repeal of the [historical] requirement of unanimous shareholder approval of fundamental corporate transactions. However, minority and marketability discounts create an incentive for oppressive action by controlling shareholders, especially in non-public corporations.

"If controlling shareholders are required to pay only market value in a reverse stock split, merger, or other squeeze-out transaction, they will not be penalized and, indeed, may be rewarded for taking actions which drive down the market value of the stock held by minority shareholders. The controlling shareholders then can squeeze out the minority shareholders at the heavily discounted market price to acquire the company on the cheap and avoid the proportionate distribution that would follow from a court-ordered dissolution under section 12.50 of the BCA [§ 10-2B-12.50, Ala.Code 1975]. The reduced value attributed to minority shares in non-public companies becomes a self-fulfilling prophecy when minority and marketability discounts are tolerated.
"Second, the corporation that squeezes minority shareholders out of the company has deprived the shareholders of a valuable right to choose whether and for how long to maintain their investment in the company. The compulsion inherent in transactions giving rise to appraisal rights and the corporation's power to time the transaction and set its terms thus support a higher measure of `fair value.'"
Thomas J. Bamonte, Measuring Stock Value in Appraisals Under the Illinois Business Corporation Act, 80 Ill. B.J. 236, 237-38 (1992) (emphasis added; footnotes omitted).
The majority rule applied in the several United States jurisdictions with respect to the calculation of "fair value" under the BCA does not allow any discounting such as that advocated by Saliba and applied by the trial court:
"A majority of the courts conclude that no discounts should be taken in *537 determining fair value, reasoning that for most purposes the enterprise should be valued as an entity and any discounts should be taken at the enterprise level. The market value of the enterprise should already be determined, and providing for further discounts at the shareholder level is inherently unfair to the minority who did not pick the timing of the transaction and is not in the position of a willing seller. Because the shares are being purchased by the corporation rather than being sold into a market, the case law rejects the assumption that fair value means fair market value. Accordingly, the value of the shares is their value to the corporation. `Any rule of law that gave the shareholders less than their proportionate share of the whole firm's fair value would produce a transfer of wealth from the minority shareholders to the shareholders in control. Such a rule would inevitably encourage corporate squeeze-outs.'"
John J. Oitzinger, Fair Price and Fair Play Under the Montana Business Corporation Act, 58 Mont. L.R. 407, 420-21 (1997) (quoting In re McLoon Oil Co., 565 A.2d 997, 1005 (Me.1989)); accord, Lawson Mardon Wheaton, Inc. v. Smith, 160 N.J. 383, 402, 734 A.2d 738, 749 (1999) (collecting cases) (footnote omitted). As a leading treatise in this area notes, "[i]t seems particularly inappropriate to apply such a [marketability] discount when a shareholder is selling to a person or family that owns all or most of the other shares of the corporation"; "[w]hile the lack of a market affects the ability to sell minority shares in a company, the market for all of a company's assets or shares or for a controlling interest operates differently and may not be adversely influenced by the fact that the company's shares are not traded." 2 F. Hodge O'Neal & Robert B. Thompson, O'Neal's Close Corporations § 9.32 (3d ed.1998).
The Model BCA has been amended within the past three years to expressly provide that marketability discounts should not be applied in calculating the fair value of corporate shares. Rather, fair value should be calculated "without discounting for lack of marketability or minority status." 3 Model Business Corporation Act Annotated (American Bar Association) § 13.01(4)(iii) (3d. ed 1998/1999 Supp.). The commentary to the new Model BCA indicates that this change was made "both because most transactions that trigger appraisal rights affect the corporation as a whole and because such discounts give the majority the opportunity to take advantage of minority shareholders who have been forced against their will to accept the appraisal-triggering transaction." Id. at 13-10. The commentary further notes that the latest Model BCA is designed to adopt the more "modern" view that an appraisal "should generally award a shareholder his or her proportional interest in the corporation after valuing the corporation as a whole, rather than the value of the shareholder's shares when valued alone." Id. Like the Georgia Court of Appeals (see Blitch v. Peoples Bank, 246 Ga.App. 453, 540 S.E.2d 667 (2000)), we view these revisions to the Model BCA and its commentary as persuasive authority in construing the current version of the BCA.
Neither Lawson Mardon Wheaton, Inc. v. Smith, supra, 160 N.J. 383, 734 A.2d 738, nor Balsamides v. Protameen Chemicals, Inc., 160 N.J. 352, 734 A.2d 721 (1999), is to the contraryin fact, they both stand for the proposition that, "absent extraordinary circumstances," a marketability discount should not be applied in determining the fair value of a dissenting shareholder's stock holdings in an action to appraise the value of those holdings. Thus, in Lawson Mardon Wheaton, dissenting shareholders who demanded *538 payment for their shares were entitled to receive the full proportionate value of those shares without reference to a 25% marketability discount suggested by the company's valuation expert. 160 N.J. at 404, 734 A.2d at 750. The New Jersey court concluded that the dissenting shareholders' desire for liquidity and their lack of confidence in the corporation's new management were not "extraordinary circumstances" that would counsel against adherence to the general no-discounting rule. Id. at 403-04, 734 A.2d at 750.
In contrast, while the New Jersey Supreme Court affirmed a trial court's application of a 35% marketability discount in Balsamides, that case involved an action under New Jersey's oppressed-shareholder statute. The particular statute involved in Balsamides expressly permitted the trial court in that case to order the sale of a closely held corporation's stock for the stock's " `fair value ... plus or minus any adjustments deemed equitable by the court' " where "`those in control ... [had] acted oppressively or unfairly toward one or more minority shareholders in their capacities as shareholders, directors, officers, or employees.' " 160 N.J. at 371, 734 A.2d at 731-32 (quoting N.J. Stat. Ann. § 14A:12-7). Compare Ala.Code 1975, § 10-2B-14.30 et seq. (establishing a cause of action for dissolution of a corporation where persons controlling the corporation have acted in an "oppressive" manner, and providing for shareholder-buyout alternative thereto). Because the trial court had directed the sale to the oppressed shareholder of the stock previously owned by the oppressor, whose unfair actions had prompted the action in the first place, the New Jersey Supreme Court concluded that it would not be equitable for the oppressor to receive the undiscounted value of his shares. Therefore, Balsamides is distinguishable here because Offenbecher, a minority shareholder lacking a controlling stake in Baron Services, was not an oppressor.
Delaware authorities relied upon by Baron Services are, like Balsamides, inapplicable. Rapid-American Corp. v. Harris, 603 A.2d 796 (Del.1992), did not involve a question of whether a minority discount should be deducted from the value of minority shares, as this case does, but whether a control premium should be added to the value of minority shares. Onti, Inc. v. Integra Bank, 751 A.2d 904 (Del. Ch. Ct.1999), applied a discount arising from a direct restriction on the transferability of the particular (nonregistered) shares of stock involved, which would amount to an "extraordinary circumstance" in the parlance of Lawson Mardon Wheaton that is not present here. Finally, Cavalier Oil Corp. v. Harnett, 564 A.2d 1137 (Del.1989), did not hold that corporate-level discounting of minority shares (such as that undertaken by the trial court in this case) was permissible; rather, the Delaware Supreme Court held that a trial court was not required to apply a minority discount in calculating the fair value of a block of stock amounting to 1.5 percent of outstanding shares.
We conclude that the application of a facially neutral marketability discount has made possible a squeeze-out merger. In 1998, the business generated pre-tax income of over $1,150,000. During the first five months of 1999, the post-merger corporation generated almost $2 million in profit. Had the majority shareholders not pursued their squeeze-out merger, Offenbecher would have received a proportionate share of over $1 million that the merged corporation distributed in the 18 months immediately following the merger, while still maintaining ownership of his stock.
*539 The controlling shareholders are the owners of the new corporation they formed for the purpose of merging Baron Services, and Offenbecher's ownership therein, out of existence. They have achieved that purpose. They will continue to reap the benefit of future earnings of the parties' business enterprise, while Offenbecher has been "squeezed out." Such a result, if allowed, will enable the controlling shareholders to accomplish indirectly what Alabama decisions regarding oppression of minority shareholders will not allow them to accomplish directly. See, e.g., Brooks v. Hill, 717 So.2d 759 (Ala.1998).
"While ... [a marketability] discount can claim more theoretical support than the minority discount, and ostensibly could apply to all shares, majority as well as minority, there is the likelihood for this to be a refuge for practitioners and courts that do not recognize the changed role of appraisal." 1 F. Hodge O'Neal & Robert B. Thompson, O'Neal's Oppression of Minority Shareholders, § 5.32 (2d ed.1999). In crediting Saliba's testimony regarding the appropriateness of a 50 percent marketability discount, the trial court not only failed to recognize the role of the modern appraisal remedy, it made possible in this case precisely the sort of squeeze-out oppression that the appraisal remedy based on "fair value" was designed to prevent. We therefore conclude that the trial court's valuation of Offenbecher's stock was erroneous as a matter of law, and we reverse the trial court's judgment as to that issue and remand for that court to calculate the value of the stock of Baron Services without regard to the 50 percent "marketability" discount espoused by Saliba.[4]
APPLICATION GRANTED; OPINION OF MAY 18, 2001, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
YATES, P.J., and CRAWLEY and PITTMAN, JJ., concur.
THOMPSON, J., concurs in part and dissents in part.
THOMPSON, Judge, concurring in part and dissenting in part.
I concur in that part of the main opinion affirming the trial court's determination of the number of outstanding shares of Baron Services stock. However, I disagree with the main opinion's conclusion that the trial court erred in valuing that stock.
The trial court's judgment sets forth its findings of facts and conclusions of law as follows:
"Before the corporate merger that prompted this action, Defendant Offenbecher owned 130 of a total of 3,300 outstanding shares in Baron Services, Inc., an Alabama corporation ('Baron Services Alabama').1
"In late 1997, following a series of disruptive actions by minority shareholders, which the company saw as efforts by those shareholders to force the company to buy them out, Baron's Board of Directors engaged Gary Saliba, of Saliba Financial Economics Group, to perform a valuation to determine the value of the stock of the corporation. Mr. Saliba conferred with the company's management; considered the company's financial records, projections of future operations, and financial information of *540 similar businesses; reviewed market conditions both of Baron Services' products and generally in the United States and Alabama; and concluded that each share of stock of the company had a value of $562.47.
"Although Baron Services believed that Mr. Saliba's evaluation was high, each minority shareholder was given a copy of Mr. Saliba's report and was offered $562.47 per share for his stock. Mike McCord and Ted Simmons agreed to sell at that price, but James Offenbecher and Clay Durrett did not. Later, as a result of lagging sales in the first few months of 1998, Mr. Saliba developed a supplemental report based on management's lower projected sales forecasts, which resulted in a small reduction in his appraisal value from $562.47 to $547.77 per share.
On March 31, 1998, the Board of Directors of Baron Services Alabama approved a plan to merge that corporation into Baron Services, Inc., a Delaware corporation (`Baron Services Delaware'). Pursuant to the plan of merger, Baron Services Delaware offered to pay $547.77 per share to each shareholder owning fewer than 150 shares of Baron Services Alabama. At that point, Mr. Durrett allowed himself to be cashed out at that reduced price. Mr. Offenbecher dissented, which resulted in this proceeding.
"The Court finds from the evidence that Mr. Saliba's appraisal, more fairly and reasonably than the appraisal performed for Mr. Offenbecher by Mr. `Butch' Williams, reflects the fair value of Mr. Offenbecher's stock `immediately before the effectuation of the corporate action to which the dissenter objects....' § 10-2B-13.01, Ala.Code 1975. Specifically, the Court finds that in several significant areas, Mr. Saliba could have employed professionally acceptable appraisal methods that would have decreased the value of Baron Services' stock below $547.77 per share, but he chose not to do so. The Court also finds that Baron Services' management's projection of future profits were reasonable based on past operations and good-faith estimates of future operations, and that Mr. Saliba's handling of the so-called `Baron Tech loss' and his use of an `annual convention' were fair and reasonable.
"The Court also finds as a matter of financial analysis that Mr. Saliba's decision to apply a marketability discount `at the corporate level' was reasonable and necessary to the determination of the `fair value' of Baron Services' stock. The Court also concludes that a marketability discount was appropriate as a matter of law.
"Although the Alabama Supreme Court has not specifically addressed discounts for nonmarketability (or illiquidity) in the context of a judicial appraisal of a dissenter's shares, our Supreme Court has long held the view that, in the valuation of stock in a closely held corporation, a court should not adopt a `fixed or arbitrary standard for the ascertainment of values,' but should consider all factors `which contribute in any degree to its desirability ... in arriving at a conclusion.' State Dep't of Revenue v. Birmingham Realty Co., 255 Ala. 269, 276, 50 So.2d 760, 766 (1951). Thus, in `estimating the value of stock in a bank or other corporation every fact condition having effect to influence or control must be considered.' Id. See also Blake v. Blake Agency, 107 A.D.2d 139, 486 N.Y.S.2d 341, 347 (1985) (court deciding on method for appraising shares should look for guidance to other contexts in which shares are appraised, regardless of whether shares are being appraised in *541 context of dissolution or dissent); cf. Weinberger v. UOP, Inc., 457 A.2d 701, 713 (Del.1983) (`We believe that a more liberal approach must include proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court ....').
"In addition, courts throughout the country, applying similar rationales, have given the trial court discretion to apply discounts, such as the marketability discount applied by Mr. Saliba, in cases such as this. See, e.g., Perlman v. Permonite Mfg. Co., 568 F.Supp. 222, 231-32 (N.D.Ind.1983), aff'd, 734 F.2d 1283 (7th Cir.1984); Pioneer Bancorporation, Inc. v. Waters, 765 P.2d 597, 599 (Colo.App.1988); Atlantic States Constr. v. Beavers, 169 Ga.App. 584, 314 S.E.2d 245, 251 (1984); Stanton v. Republic Bank of S. Chicago, 144 Ill.2d 472, 581 N.E.2d 678, 682, 163 Ill.Dec. 524 (1991); Independence Tube Corp. v. Levine, 179 Ill.App.3d 911, 129 Ill.Dec. 162, 535 N.E.2d 927, 931 (1988); Ford v. Courier-Journal Job Printing Co., 639 S.W.2d 553, 556 (Ky.App.1982); Friedman v. Beway Realty Corp., 87 N.Y.2d 161, 661 N.E.2d 972, 638 N.Y.S.2d 399, 402-03 (1995); Matter of Fleischer, 107 A.D.2d 97, 486 N.Y.S.2d 272 (1985); Blake v. Blake Agency, supra; Columbia Mgmt. Co. v. Wyss, 94 Or.App. 195, 204-05, 765 P.2d 207, 213-14 (1988).
"It is also well recognized that there is a fundamental difference between applying a discount to reflect lack of marketability, which affects all shareholders, and applying a discount to only the minority shares, which arguably imposes a penalty on the minority shareholders for lack of control. Courts have explained that difference as follows:
"`In determining the "fair value" of the shares of a closely held corporation, discounts for the lack of marketability of such shares are appropriate and do not provide a windfall to the majority shareholders merely because the shares to be purchased by the majority pursuant to their election under Business Corporation Law § 1118 constitute a minority interest in the corporation (see Matter of Blake, [sic] supra). We note that petitioner argues on appeal that Special Term applied a minority interest discount to the value of the shares. This is simply not so. What was applied was a lack of marketability discount. (cf. Matter of Blake, [sic] supra).'
"In re Fleischer, 107 A.D.2d at 101, 486 N.Y.S.2d at 275. Accord, Blake v. Blake Agency, supra; Ford v. Courier-Journal Job Printing Co., supra. In this case, the marketability discount applied by Mr. Saliba affected all shareholders and was not applied only against the minority shareholders as a penalty for lack of control.
"A recent decision by a Delaware court addressed the precise issue of whether marketability discounts are permissible in a cash-out merger case like this one.
"`In Cavalier Oil Corp. v. Harnett, [564 A.2d 1137 (Del.1989)], the Supreme Court authorized corporate level discounting but not shareholder level discountingi.e., if a stock discount affects the entire company, it should be considered in the appraisal, but if it only affects certain shareholders (such as a minority discount does), it should be eliminated by an upwardly adjusted market value. The Cavalier Oil Court found that a shareholder level discount" fail[s] to accord to a minority shareholder the full proportionate value of his shares [which] imposes a penalty for lack of control, and unfairly enriches the majority shareholders." *542 Here, however, the discount that results from the restrictions on the shares affects not just the Counterclaimants but also Counterclaim defendants.'
"Onti, Inc. v. Integra Bank, 751 A.2d 904, 913 (Del.Ch.1999). Accord, Rapid-American Corp. v. Harris, 603 A.2d 796 (Del.1992).
"For all the foregoing reasons, the Court concludes that Baron Services has offered Mr. Offenbecher the fair value of his shares, $547.77 per share, based on a professionally developed and fair appraisal of the value of his shares of stock that the Court finds was consistent in all respects with applicable law.
"_________________________
"1 The Court finds that 2,000 shares of stock were properly issued to the Baron Family Trust in March 1992, after Bob Baron's father, Oakley Baron, paid the company $20,000 for the stock, that payment was recorded as paid-in capital, and a certificate for that stock was issued to [Oakley] Baron as Trustee for the Baron Family Trust on March 5, 1992".
I disagree with the main opinion's reversal of the trial court's determination of the "fair value" of the Baron Services stock.
"`Fair value,' with respect to a dissenter's shares, means the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable."
§ 10-2B-13.01(4), Ala.Code 1975.
The trial court found that Saliba's valuation of the Baron Services stock shares was correct, and it adopted his $547.77 per-share value as a part of its judgment. In arguing that the trial court erred in reaching its determination of the fair value of the stock, Offenbecher maintains only that the fair value of the stock "cannot be" the value reached by the trial court, given the financial income of Baron Services. I do not believe that that argument is sufficient to warrant a reversal of the trial court's determination of the fair value of the stock. The remainder of Offenbecher's argument relates to his contention that the trial court erred in applying a marketability discount to reach its determination of the fair value of Baron Services stock.
A marketability discount is an adjustment applied to a valuation of stock, intended to reflect the decreased worth of stock in a closely held corporation, for which there is no readily available market. Balsamides v. Protameen Chems., Inc., 160 N.J. 352, 734 A.2d 721 (1999).
"Before exploring the issue of marketability discounts, it is useful to understand the distinction between a marketability discount and a minority discount. A minority discount adjusts for lack of control over the business entity, while a marketability discount adjusts for a lack of liquidity in one's interest in an entity. Even controlling interests in nonpublic companies may be eligible for marketability discounts, as the field of potential buyers is small, regardless of the size of the interest being sold."
Balsamides v. Protameen Chems., Inc., 160 N.J. at 373, 734 A.2d at 733. The court also noted: "Some commentators observe that a marketability discount is not a discount at all. Rather, it is a price adjustment reflecting factors typical of close corporations." Balsamides v. Protameen Chems., Inc., 160 N.J. at 379, 734 A.2d at 736. In his appeal, Offenbecher addresses only the issue of the marketability discount; he makes no argument that the trial court improperly applied a minority discount in determining the value of the Baron Services stock.
*543 In support of his argument on the issue of the marketability discount, Offenbecher cites only two cases, Lawson Mardon Wheaton, Inc. v. Smith, 160 N.J. 383, 734 A.2d 738 (1999), and Balsamides v. Protameen Chems., Inc., supra. In Lawson Mardon Wheaton, Inc. v. Smith, the Supreme Court of New Jersey held that marketability discounts should not be applied in determining the fair value of a dissenting shareholder's stock, absent "extraordinary circumstances." In so holding, the court stated:
"A rule that imposes a discount on the exiting dissenting shareholder `fail[s] to accord to a minority shareholder the full proportionate value of his shares ... [and] enriches the majority shareholder who may reap a windfall from the appraisal process by cashing out a dissenting shareholder....' ... `Any rule of law that [gives] the shareholders less than their proportionate share of the whole firm's fair value would produce a transfer of wealth from the minority shareholders to the shareholders in control. Such a rule [also] would inevitably encourage corporate squeeze-outs....'"
Lawson Mardon Wheaton, Inc. v. Smith, 160 N.J. at 402, 734 A.2d at 749. Thus, the court refused to apply a marketability discount at the shareholder level and instead required that a dissenting shareholder receive his proportionate share of the company.
In Balsamides v. Protameen Chemicals, Inc., supra, the New Jersey Supreme Court noted that it had held in Lawson Mardon Wheaton that, absent extraordinary circumstances, marketability discounts should not be applied in determining the value of a dissenting shareholder's stock. Although the court in Balsamides defined "marketability discount" in terms of "one's interest" in a company, it noted that applying a discount at the corporate level might be appropriate. 160 N.J. at 373, 734 A.2d at 733. The court in Balsamides held that extraordinary circumstances present in that case warranted a marketability discount. The court characterized the selling party as "the oppressor," and stated that allowing the selling party to avoid the marketability discount would result in a windfall to the selling party. Balsamides, 160 N.J. at 378-79, 734 A.2d at 736. The court stated that if the parties sold their stock at the same time, the price they would receive for the stock of the closely held corporation would reflect the corporation's illiquidity. The court held that the purchasing party "should not bear the brunt of [the company's] illiquidity merely because he is the designated buyer." Balsamides, 160 N.J. at 378, 734 A.2d at 736. The court's holding resulted in the parties' sharing the cost of the closely held corporation's lack of marketability.
In the commentary to § 10-2B-13.01, Ala.Code 1975, which contains Alabama's statutory definition of "fair value," our legislature indicated that Delaware law was valuable in determining fair value of a dissenting shareholder's stock. In Cavalier Oil Corp. v. Harnett, 564 A.2d 1137 (Del.1989), the Delaware Supreme Court distinguished between a permissible corporate-level discounting and an impermissible stockholder-level discounting. The court affirmed the lower court's refusal to apply a minority discount to the dissenter's stock in valuing that stock. The court stated that the dissenting shareholder should receive his proportionate share of the company after it had been valued as an entity. Cavalier Oil Corp., 564 A.2d at 1144.
In Rapid-American Corp. v. Harris, 603 A.2d 796 (Del.1992), the Delaware Supreme Court stated that a dissenting shareholder's stock must be valued as his *544 or her proportionate share of the company. The court reversed the trial court's refusal to allow a "control premium" that would affect the value of all of the company's stock. The court characterized the control premium as a "valid adjustment to [the trial court's] valuation" of the company. Rapid-American Corp. v. Harris, 603 A.2d at 805.
In Onti, Inc. v. Integra Bank, 751 A.2d 904 (Del.Ch.1999), cited by the trial court in its judgment, the court held that a marketability discount at the corporate level was appropriate. In so holding, the court reiterated that a discount that affects the entire company is permissible, but that one that affects only certain shareholders is impermissible. Onti, Inc. v. Integra Bank, 751 A.2d at 913.
The Alabama Business Corporation Act, § 10-2B-1.01 et seq., Ala.Code 1975, which became effective in March 1994, is modeled after the American Bar Association's Revised Model Business Corporation Act. See § 10-2B-1.01 Commentary. In 1999, the Model Act's definition of "fair value" was modified to expressly provide that discounts for lack of marketability and minority status should not be applied in determining the fair value of stock. The commentary to the Model Act states that a dissenting shareholder should, generally, be awarded his or her proportional interest, rather than the value of his or her interest in the company valued alone.
In Blitch v. Peoples Bank, 246 Ga.App. 453, 540 S.E.2d 667 (2000), the Supreme Court of Georgia noted that the 1999 revision to the Model Business Corporation Act resulted in a change in the definition of "fair value." Although Georgia had not yet adopted the new definition of "fair value" contained in the Model Act, the court found that the revised act and its comments were persuasive authority in determining the meaning of "fair value" under the Georgia Code provisions. The court concluded that "the term fair value in [Georgia's] statute encompasses the modern view expressed by the Model Act that a shareholder should generally be awarded his or her proportional interest in the corporation after valuing the corporation as a whole." Blitch v. Peoples Bank, 246 Ga.App. at 457, 540 S.E.2d at 670.
The marketability discount approved by the trial court was applied to all of the shares of Baron Services stock, not just to the shares of stock of the minority shareholder. Although a marketability discount might not be appropriate in all cases involving a dissenting shareholder, I would affirm the trial court's use of the marketability discount in this case. The trial court adopted Saliba's method of valuing the Baron Services stock. Saliba made a corporate-level adjustment to the values of the stock of every share of Baron Services stock for lack of marketability, because, in calculating the value of that stock, he had used values comparable to those used for publicly traded companies. In response to the trial court's questioning regarding his opinion on the fair value of the Baron Services stock immediately before the purchase offer, Saliba responded:
"[SALIBA]: Based on my interpretation of the law, I would put [the fair value] at $562.
"THE COURT: Can you tell me why?
"[SALIBA]: The same kind of explanation I just gave you is the company is notthe $1,124 is based on not considering anything related to cost of capital differences between [Baron Services] and public companies, and the fact that it is not public and I did not make those adjustments directly, I waited to make them at the end of the day, so to speak, with the 50% discount. If I had not made that adjustment, I would have raised my cost-of-capital numbers and I *545 would have increased the public-offering discount and I would have included a liquidity premium for that shareholder, and those numbers would be in the $562 range, and the $1,124 number would have never appeared. It would have never been anywhere in the report."
The trial court concluded that Saliba's valuation represented the value of the corporation valued as a whole. The $547.77[5] per-share value Saliba reached represented the value of every share of Baron Services stock, after Saliba had applied the marketability discount to his calculation, which used figures for calculating the value of public companies. The trial court expressly found that Saliba had applied the marketability discount at the corporate level, rather than at the shareholder level, and, therefore, that, at the price of $547.77 per share, Offenbecher would receive payment for his proportionate interest of Baron Services. Given the caselaw discussed above, I believe that the trial court's adoption of the proportionate corporate-level marketability discount in valuing the Baron Services stock was permissible, and I conclude that its valuation of the Baron Services stock utilizing that discount is entitled to a presumption of correctness on appeal. See D.J. Sherwood Transp. v. Road Shows, Inc., 656 So.2d 884 (Ala.Civ.App.1995) (affording a presumption of correctness to the trial court's valuation of a joint venture where the trial court received conflicting ore tenus testimony).
I would also reject Offenbecher's argument that the marketability discount rate of 50% was excessive. Saliba's report detailing his valuation of the Baron Services stock indicates that discounts ranging from 40% to 63% had been used in valuing similar closely held corporations. Williams, Offenbecher's expert witness, disagreed with the use of a marketability discount and the amount of the discount used by Saliba. However, I conclude that the record contains evidence that supports the trial court's determination regarding the amount of the marketability discount. Given the evidence in the record, I cannot say that the 50% marketability discount adopted by the trial court was excessive.
For the foregoing reasons, I conclude that Offenbecher failed to demonstrate that the trial court erred in its valuation of the Baron Services stock. Therefore, I dissent from the main opinion's reversal on that issue.
NOTES
[1] That corporation is also known as "Baron Services, Inc."
[2] We note that the amount of money paid into court by Baron Services and awarded to Offenbecher ($72,488.49) included accrued interest of approximately $9.83 per share.
[3] In calculating this "marketable value" of the Baron Services stock, Saliba used a "discounted annual rate of return" of 19.82%. The factors considered by Saliba in calculating this discount rate included three discounts reflective of the company's small, non-publicly held, status, namely those discounts that Saliba variously labeled and assessed as an "equity risk premium" of 7.5%, a "micro-capitalization premium" of 3.5%, and a "company-size premium" of 4.35%. Nonetheless, Baron Services contends on appeal that a marketability discount was necessary because no adjustments had been made for Baron Services "being a private company and for its cost of capital and access to capital and those material factors." Baron Services quotes Saliba's testimony that, "If I had not made [the marketability] adjustment, I would have raised my cost of capital numbers and I would have increased the public offering discount and I would have included a liquidity premium." The quantitative significance of the "cost of capital" factor is not readily apparent from the record. Elsewhere in his testimony, Saliba testified that there was relative "ease of market entry" in Baron Services' market because of "the absence of a whole lot of capital requirement," and that "the company's capitalization was adequate." Nor is the relevance of a "public offering discount" readily apparent from the record. Both this discount and the "liquidity premium" referenced by Saliba appear from the record to address some of the same concerns as does a "marketability discount."
[4] In his statement of the issues, Offenbecher maintains that he was entitled to an award of an attorney fee at trial. However, in his brief on appeal, Offenbecher makes no argument regarding this issue, in contravention of Rule 28, Ala. R.App. P. Therefore, the issue is waived. Boshell v. Keith, 418 So.2d 89 (Ala.1982).
[5] After first determining the stock was worth $562.47 per share, Saliba supplemented his report to recalculate the share value based on a lower projected sales forecast, and he determined that, based on that forecast, the stock was worth $547.77 per share.